**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MARK ROGERS,
　　　　　*Petitioner-Appellee*,

v.

JAMES DZURENDA; ADAM PAUL LAXALT; WILLIAM GITTERE, Warden,
　　　　　*Respondents-Appellants.*

No. 19-17158

D.C. No. 3:02-cv-00342-GMN-WGC

OPINION

Appeal from the United States District Court
for the District of Nevada
Gloria M. Navarro, District Judge, Presiding

Argued and Submitted April 19, 2021
Seattle, Washington

Filed February 14, 2022

Before: Ronald M. Gould, Andrew D. Hurwitz, and
Mark J. Bennett, Circuit Judges.

Opinion by Judge Gould;
Concurrence by Judge Hurwitz;
Separate Statement by Judge Hurwitz;
Dissent by Judge Bennett

**SUMMARY**[*]

---

**Habeas Corpus**

Affirming the district court's judgment granting Mark Rogers's 28 U.S.C. § 2254 habeas corpus petition challenging his murder convictions, the panel held that: (1) Rogers satisfied the *Strickland v. Washington* two-prong test for ineffective assistance of counsel; and (2) the district court did not abuse its discretion in conditionally granting Rogers's habeas petition and giving the State of Nevada the option to adjudicate Rogers not guilty by reason of insanity ("NGRI") or to retry him.

Because the ineffective assistance claim before the district court was never adjudicated on the merits by the Supreme Court of Nevada, the panel reviewed the claim *de novo*.

On *Strickland*'s deficient performance prong, the panel held that, even applying the presumption of reasonableness, trial counsel's investigation, preparation, and execution of their chosen insanity defense fell below an objective standard of reasonableness. The panel wrote that (1) trial counsel's most significant error was failing to call as a witness—or consult at all—the expert the trial court had appointed to assess Rogers's competency for trial and sanity at the time of the offenses; (2) this error was compounded by the inadequate preparation of counsel's chosen mental health experts; (3) trial counsel performed deficiently by not preparing to rebut the State's mental health expert; and

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

(4) trial counsel's failure to explain the elements of the NGRI defense to the jury in their opening statement fell below an objective standard of reasonableness.

On *Strickland*'s prejudice prong, and focusing on what a reasonable, impartial juror would find compelling, the panel concluded there was a reasonable likelihood that Rogers's NGRI defense would have succeeded if trial counsel had performed effectively.

Although trial counsel's performance was replete with errors, the panel emphasized that the State's staffing and funding of Rogers's case contributed to those errors.

The panel concluded that the district court—which conditionally granted the writ with instructions for the State to either adjudicate Rogers NGRI or retry him—did not abuse its discretion in fashioning relief, which is narrowly tailored to address the ineffective assistance of counsel without awarding Rogers an unwarranted windfall.

Judge Hurwitz concurred in full. He also filed a separate statement, joined by Judges Gould and Bennett, in which he emphasized that the difficult issues confronted in this case might have been avoided had Nevada paid sufficient attention to the appointment of qualified capital counsel.

Judge Bennett dissented. He wrote that the majority's characterization of the trial as a battle of experts obscures reality. He agreed that Nevada failed Rogers in allowing such inexperienced counsel to defend him in a capital case, but wrote that the facts left little room for masterful counsel, much less merely adequate counsel, to have proven that Rogers was legally insane when he committed the killings;

and that even considered together, the alleged errors identified by the majority did not prejudice the defense.

## COUNSEL

Jessica E. Perlick (argued), Deputy Attorney General; Aaron D. Ford, Attorney General; Office of the Attorney General, Las Vegas, Nevada; for Respondents-Appellants.

Heather Fraley (argued) and Randolph M. Fiedler, Assistant Federal Public Defenders; Rene L. Valladares, Federal Public Defender; Office of the Federal Public Defender, Las Vegas, Nevada; for Petitioner-Appellee.

**OPINION**

GOULD, Circuit Judge:

When newly minted attorney Virginia Shane was appointed as lead counsel in a capital case involving a triple murder, she was not set up for success. Indeed, the deck was stacked against her. Shane's client, Mark Rogers, stood accused of murdering three members of the Strode family. Shane was appointed as Rogers's attorney a mere four months after passing the Nevada bar exam. At that time, she was the only attorney in a satellite office of the Nevada State Public Defender ("NSPD"). Shane recognized immediately after her appointment that a "not guilty by reason of insanity" ("NGRI") argument was her client's strongest—and his only meaningfully supported—defense. Despite these circumstances, Shane received little or no help preparing Rogers's insanity defense until another public defender—equally inexperienced in presenting an insanity defense—became co-counsel shortly before trial.

Trial counsel's representation of Rogers reflected their lack of experience. Their performance was characterized by the failure to take basic steps to prepare their chosen mental health experts for trial and to rebut the State of Nevada's foreseeable evidence. They did not call or even consult the one expert, Dr. Donald Molde, appointed by the court to address Rogers's legal sanity at the time of the offense. These deficiencies made the defense's insanity case less supported, less persuasive, and more vulnerable to predictable and preventable attacks by the prosecution.

The State appeals the district court's judgment granting Rogers's 28 U.S.C. § 2254 habeas corpus petition, which challenged his murder convictions. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253. Reviewing Rogers's

ineffective assistance of counsel claim *de novo*, *see infra* Section II.A, we affirm.  We hold that: (1) Rogers has satisfied the *Strickland v. Washington* two-prong test, having demonstrated both that (a) trial counsel exhibited deficient performance and (b) that performance prejudiced Rogers; and (2) the district court did not abuse its discretion in conditionally granting Rogers's habeas petition and giving the State the option to adjudicate Rogers NGRI or to retry him.

# I

## A

On December 1, 1980, while hitchhiking near Winnemucca, Nevada, Rogers was picked up by Robert Schott.  Schott described Rogers as nervous and speaking erratically.  Rogers blurted out statements like, "You may not believe it[,] but I'm a good American," and "You may not believe it[,] but I'm on your side."  After driving roughly thirty minutes, and while Schott was "on the top of a bridge," Rogers bluntly said, "Let me out, now."  Schott let him out.

Around 12:30 p.m. the next day, David Hartshorn picked up Rogers, who was then hitchhiking about twenty miles from Imlay, Nevada.  Hartshorn also had a strange conversation with Rogers.  Rogers introduced himself as "Teepee," and when Hartshorn asked Rogers where he was going, he said, "Nowhere."  Among other things, Rogers told Hartshorn that he lived in a pyramid and that "Somebody is shooting rockets off of Mount Olympus and one of these days it will hit my pyramid and blow me up."  Rogers also told Hartshorn, "This is my land.  I own it all."  Hartshorn gave Rogers a can of soda, which was later found at the crime scene.  Rogers also explained that he had slept "[r]ight here," referring to a stretch of highway.

Around 3:30 p.m. that same afternoon, highway maintenance foreman Earl Smith saw Rogers walking roughly seventeen miles south of Denio, Nevada, about 130 miles north of Imlay. Smith and then some of his workers separately gave Rogers a ride. After their interactions with Rogers, Smith and another highway maintenance worker described him as nervous, giving odd answers to questions, and wearing jeans with drawings on them. Some time that day, December 2, 1980, three members of the Strode family were murdered. *Rogers v. State*, 101 Nev. 457, 461 (1985).

Rogers was next seen three days later. He tried to enter Canada through the Washington border, wearing a parka-like coat with what appeared to be a towel wrapped around his head or neck. Rogers had gotten into an accident in the Strodes' truck and abandoned it about ten miles south of the Canadian border. When questioned by Canadian immigration authorities, he claimed alternatively that he was a United States citizen and a Canadian citizen.

While interacting with Canadian authorities, Rogers's behavior quickly became angry and erratic. Among other things, he stated that: (1) he wanted political asylum in Canada because he was being persecuted by numerous organizations, including the CIA, motorcycle gangs, the FBI, and the Mafia; (2) he was the "King of North America"; and (3) he was the "Emperor of North America." Rogers was denied entry to Canada.

After vanishing for a period, Rogers reemerged in January 1981. He was arrested in Florida for the Strode murders while standing on the bumper and hanging on to the luggage rack of a station wagon driving down the highway. Rogers told an officer he was standing on the bumper because two men were pursuing him. Rogers then told the

officer, "God knew me and that we are all a part of mother nature."  In his pocket was a small pad which contained no writing but included drawings of pyramids, figure eights, and other symbols.  During questioning, Rogers wrote "I belong to the government" on a paper.  Later, at the jail, Rogers claimed that he killed the Strode family in self-defense. *Rogers*, 101 Nev. at 462.

## B

Rogers was charged in Nevada with capital murder. Shortly after his arrest, and still in January 1981, Virginia Shane was appointed as his lead counsel.  Shane worked for the NSPD in its Winnemucca office, where for most of the time she was the only public defender on site.  The Winnemucca office was three hours from the main office in Carson City.  Shane—who had passed the bar just four months before her appointment—had little legal experience and had never handled a capital case.  She also had a workload of over eighty cases, including another capital case and a first-degree murder case.  Approximately three months before trial, and several months after Shane was appointed, Robert Bork was added to the defense team.  Bork had been a lawyer for only four years at the time of Rogers's trial. Like Shane, Bork had no experience presenting an insanity defense or handling a capital case.

Shortly after her appointment, Shane decided to pursue an NGRI defense.  Shane and the prosecutor requested a mental health evaluation for Rogers, to be conducted at the Lake's Crossing Center for Mentally Disordered Offenders ("Lake's Crossing").

The trial court appointed three psychiatrists to assess Rogers.  The court directed Dr. Donald Molde to evaluate Rogers to determine whether he was competent to stand trial

and assist in his defense, and whether he was sane at the time of the offense. The court appointed two other psychiatrists solely to address Rogers's competency to stand trial: Dr. Louis Richnak, the Lake's Crossing medical director, and Dr. Phillip Rich, who also did evaluations at Lake's Crossing and taught at the University of Nevada's medical school.

At Rogers's competency hearing, Dr. Richnak testified that Rogers was schizophrenic and not competent to consult with his attorneys. Dr. Molde testified that Rogers "had signs and symptoms of paranoid schizophrenia," but he nevertheless thought Rogers was competent to stand trial. Significantly, however, Dr. Molde opined that Rogers was likely not competent at the time of the *offense* or his arrest. Lake's Crossing psychologists Martin Gutride and Robert Hiller both testified that Rogers was competent to stand trial. The trial court ordered further testing and evaluation.

Several months after the competency hearing, the trial court found Rogers competent to proceed to trial.

## C

In the eight months before trial, at least ten mental health professionals evaluated Rogers. Although Shane had decided to present an NGRI defense immediately after her appointment, trial counsel waited until the month before trial to discuss the issue of insanity with any mental health professional.[1]

---

[1] Trial counsel asked one psychiatrist, Dr. Ira Pauly, to do a mental status examination two months before trial on the issue of competency. But it was not until October 1981, one month before trial, that trial

Trial counsel selected three psychiatrists to support Rogers's insanity defense: Drs. Richnak (who had testified at Rogers's competency hearing), Rich, and Ira Pauly. Although Dr. Molde had previously testified about Rogers's competency at the time of the offense, evaluated Rogers five times before trial, and diagnosed Rogers with schizophrenia, trial counsel did not consult him in preparation of Rogers's NGRI defense nor ask him to testify at trial.

Despite choosing Drs. Richnak and Rich to testify for the defense, trial counsel never met with them before trial or prepared them for their testimony by, among other things, going through the DSM-III[2] with them or discussing the report of the State's expert. Trial counsel also did not give Drs. Richnak and Rich the police reports detailing Rogers's extraordinary behavior before and after the offense. Further, trial counsel did not even discuss Rogers's mental state at the time of the offense with the two experts before they took the stand. The only expert with whom trial counsel discussed the issue of insanity before trial was Dr. Pauly. But trial counsel did not meet with Dr. Pauly in person, discuss with him the other expert reports that contradicted his conclusion that Rogers was schizophrenic, or give him daily progress notes from Lake's Crossing that detailed Rogers's behavior while he was being evaluated.

---

counsel asked Dr. Pauly to do a second evaluation, after which he diagnosed Rogers with paranoid schizophrenia.

[2] The DSM-III is the third edition of the Diagnostic and Statistical Manual of Mental Disorders, published by the American Psychiatric Association in 1980.

**D**

At Rogers's trial, the prosecution explained the elements that the State needed to prove for the jury to convict. Shane, by contrast, did not explain Rogers's NGRI defense in her opening statement.

The defense presented three expert witnesses. Drs. Rich and Richnak opined that Rogers was schizophrenic, but they also maintained that it was not possible for them to determine his mental state at the time of the offense because of Rogers's unwillingness or inability to discuss the crime. Dr. Pauly testified that Rogers was insane at the time of the offense, and that he had arrived at this conclusion based on his brief evaluation of Rogers and, "most importantly," bystander reports. He also noted that Rogers had displayed violent and antisocial behaviors in the past.

On rebuttal, the State called Lake's Crossing psychologist Martin Gutride. Based on his daily interactions with Rogers and psychological testing, Dr. Gutride testified that he had diagnosed Rogers with antisocial personality disorder ("ASPD").

The prosecution's closing argument emphasized testimony from the defense experts that Rogers was violent and deceptive. The State argued that Rogers was a theatrical actor whose bizarre behavior was evidence he knew he was guilty and was trying to avoid criminal liability. The defense split their closing argument, with Bork principally arguing that Rogers did not commit the offense and Shane arguing that Rogers did not know the nature or quality of his acts at the time of the offense.

The jury rejected the NGRI defense and found Rogers guilty of three counts of first-degree murder.  Rogers was sentenced to death.

**E**

Rogers's conviction and sentence were affirmed by the state appellate court on direct appeal.  Rogers then sought post-conviction relief in state court.  Mary E. Boetsch, who was appointed as post-conviction counsel, spent about eight hours drafting a five-page petition containing seven claims for relief.  The petition argued that trial counsel were ineffective "in presenting an insanity defense in that defense counsel presented the testimony of Dr. Rich[,] who stated that it would be difficult for him to determine the mental status of Petitioner at the time of the offenses as he was not present there and had no facts or history[,] just prior to the testimony of Dr. Pauly, who testified that he could make such a determination."  In preparing Rogers's petition, appointed post-conviction counsel did not (1) investigate or meaningfully interview trial counsel; (2) consult experts regarding Rogers's mental state at the time of the offense; (3) interview trial witnesses; (4) request Lake's Crossing records; (5) interview Rogers's family or friends; or (6) review the complete trial record.

After a hearing, the post-conviction state court found Rogers competent and proceeded with a hearing on the petition for post-conviction relief.  The court then rejected the claims for relief and concluded that "any alleged errors of trial counsel were either trial strategy choices made by the trial attorneys or errors which were not so serious that counsel was not functioning as counsel guarantee[d] by the Sixth Amendment."  The Supreme Court of Nevada affirmed the denial of post-conviction relief.

Rogers filed his first federal habeas petition in 1987. "Twice, his federal petitions contained both exhausted and unexhausted claims, and twice his federal petitions were stayed, and ultimately dismissed without prejudice so that Rogers could return to state court, file new state petitions for post-conviction relief, and present the unexhausted claims in state court." *Rogers v. McDaniel*, 793 F.3d 1036, 1040 (9th Cir. 2015). Both successive state petitions were dismissed. *Id.*

Rogers filed his third petition, the operative petition in this appeal, in June 2002. *Id.* Claim Five contended that trial counsel were ineffective for failing to investigate or adequately present the chosen insanity defense. Rogers asserted, among other things, that trial counsel did not properly investigate his background to provide that information to his experts, and trial counsel did not impeach Dr. Gutride's testimony with readily available evidence.

In 2011, the district court rejected Claim Five on the merits. On appeal, we remanded for the district court to reconsider Claim Five in light of *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014) (en banc). *See Rogers*, 793 F.3d at 1045. On remand, the district court conducted an evidentiary hearing on Claim Five and heard testimony from both of Rogers's trial attorneys, defense expert Dr. Pauly, Dr. Molde, and a *Strickland* expert, Martin Wiener.

At the evidentiary hearing, trial counsel testified to their lack of experience presenting an insanity defense and the mistakes they made in preparing their witnesses for trial. Trial counsel admitted to not taking basic steps to prepare their witnesses for trial and conceded that they had no strategic justification for those omissions. While trial counsel acknowledged that it was important to corroborate

Rogers's mental illness in childhood, they admitted that they did not investigate Rogers's childhood or provide information about his childhood to their experts. Trial counsel testified that they did not give their experts essential documents that trial counsel already had in their possession, or which were readily available. Trial counsel admitted to not preparing to cross-examine Dr. Gutride with evidence such as Lake's Crossing records and the DSM-III, and that they had no strategic reason for not doing so. Finally, trial counsel admitted to never speaking with Dr. Molde, the only court-appointed expert to assess Rogers's mental state at the time of the offense, and who had stated after his examination that he believed Rogers was insane when committing the crime.

Drs. Pauly and Molde's testimony confirmed trial counsel's account of the preparation for Rogers's trial. Dr. Pauly confirmed that he never met with trial counsel face-to-face and never received certain documents. Dr. Molde confirmed that he had never spoken with trial counsel. Dr. Pauly explained how the Lake's Crossing daily progress notes, which he did not receive before trial, would have been helpful to him. He also emphasized that evidence of Rogers's behavior as a child could have been explained as prodromal symptoms of schizophrenia. Dr. Molde opined that Dr. Pauly's testimony at Rogers's trial was strong, but he also described the testimony he would have provided at trial if he had been asked to testify, including his conclusion that Rogers was insane at the time of the offense.

Rogers's *Strickland* expert, Martin Wiener, concluded that trial counsel's performance in presenting Rogers's insanity defense "absolutely" did not satisfy the standard of practice in Nevada in 1981. As he explained, "it was just a series of compound mistake[s] . . . that really diminished the

strength of the insanity defense at trial." Wiener discussed the importance of preparing experts for their testimony by providing them all relevant records. He then testified that the standard of practice required counsel to prepare to rebut the State's experts and evidence. For each of the above, Wiener explained how trial counsel performed deficiently by failing to meet the prevailing standard.

The district court first found that Claim Five had been "fundamentally altered" from the ineffective assistance of counsel claim Rogers had raised in the state post-conviction proceeding. As a result, Rogers's Claim Five was procedurally defaulted under *Martinez v. Ryan*. The district court next found that Rogers overcame the procedural default because his first state post-conviction counsel was ineffective for failing to raise Claim Five. Accordingly, the district court reviewed the merits of Claim Five *de novo* and determined that Rogers was entitled to relief.

This timely appeal followed.

## II

We first address whether Rogers's trial counsel was constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984). We conclude that trial counsel's execution of their chosen insanity defense fell below objective standards of reasonableness and was therefore deficient performance. *Id.* at 687. We also conclude that trial counsel's deficient performance prejudiced Rogers. *Id.*

### A. Standard of Review

"We review *de novo* the district court's decision to grant or deny a petition for writ of habeas corpus." *Rhoades v. Henry*, 638 F.3d 1027, 1034 (9th Cir. 2011). We also review

ineffective assistance of counsel claims, which present mixed questions of law and fact, *de novo*. *Id.* But we review "[f]actual findings and credibility determinations made by the district court in the context of granting or denying the petition . . . for clear error." *Larsen v. Soto*, 742 F.3d 1083, 1091–92 (9th Cir. 2013) (quoting *Lambert v. Blodgett*, 393 F.3d 943, 964 (9th Cir. 2004)).

Because Rogers filed his operative habeas petition in 2002, his appeal would ordinarily be governed by the deferential standard of review mandated the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2244. But that standard of review only applies "with respect to any claim that was adjudicated on the merits in State court." 28 U.S.C. § 2254(d). Here, the district court determined that Claim Five, as alleged in the operative petition, included new factual allegations such that the claim previously considered by the state court was "fundamentally altered." *See Dickens*, 740 F.3d at 1319. If a claim has been fundamentally altered, it was not adjudicated on the merits in state court and is procedurally defaulted. *Id.* at 1318. As a result, the district court could review Rogers's Claim Five only if he overcame the procedural default. The district court then found that Rogers overcame the procedural default because his counsel at the state collateral review proceeding was ineffective. *See Martinez*, 566 U.S. at 14. After finding that Rogers overcame the procedural default, the district court reviewed the merits of Rogers's claim *de novo*, "[b]ecause this claim, as now presented, was not adjudicated on its merits in state court."

On appeal, the State does not challenge the district court's decision not to apply AEDPA deference to the state court's adjudication of Rogers's ineffective assistance of

counsel claim.[3]    Because the ineffective assistance of counsel claim before the district court was never adjudicated on the merits by the Supreme Court of Nevada, we review Rogers's Claim Five *de novo*. *Rodney v. Filson*, 916 F.3d 1254, 1258 (9th Cir. 2019) ("[A]ny federally reviewable claims that were not adjudicated on the merits in state court are reviewed de novo.").

## B. Ineffective Assistance of Counsel Legal Standard

To succeed on a claim of ineffective assistance of counsel ("IAC") under the Sixth Amendment, a petitioner must prove: (1) that his counsel's performance fell below an objective standard of reasonableness (the deficient performance prong); and (2) that there is a reasonable probability of a more favorable outcome if counsel performed effectively (the prejudice prong). *Strickland*, 466 U.S. at 687–88, 694.

On the deficient performance prong, the petitioner must show that "counsel made errors so serious that [they] [were] not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Counsel's errors are assessed by referring to "prevailing professional norms." *Id.* at 688. There is no checklist of required events for satisfactory attorney performance, and counsel is "strongly presumed" to have performed effectively. *Id.* at 688, 690. Because "[e]ven the best criminal defense attorneys would not defend a particular client in the same way," *id.* at 689, leeway must be allowed for tactical decisions at trial. Courts

---

[3] Although a habeas court may exercise its "discretion to raise procedural default sua sponte if doing so furthers" the interests of comity, federalism, and judicial efficiency, *Boyd v. Thompson*, 147 F.3d 1124, 1127 (9th Cir. 1998), we decline to exercise that discretion here.

must also adopt counsel's perspective at the time of the challenged conduct to avoid the "distorting effects of hindsight." *Id.*

Even considering the deference owed to strategic decisions by counsel, *see id.*, courts have held that counsel can perform deficiently by, among other things, failing to adequately investigate the defendant's background, *see Williams v. Taylor*, 529 U.S. 362, 390–91 (2000); to prepare witnesses, including mental health experts, *see Bean v. Calderon*, 163 F.3d 1073, 1080–81 (9th Cir. 1998); and to prepare to rebut opposing counsel's witnesses with known or readily available information, *see Harris v. Blodgett*, 853 F. Supp. 1239, 1265–66 (W.D. Wash. 1994), *aff'd sub nom. Harris v. Wood*, 64 F.3d 1432, 1436, 1438 (9th Cir. 1995).

On the prejudice prong, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. This is not a "more likely than not" standard, but the likelihood of a different result must be more than "just conceivable." *Harrington v. Richter*, 562 U.S. 86, 111–12 (2011). The prejudice prong "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). The prejudice inquiry does not focus solely on "mere outcome determination"; attention must also be given "to whether the result of the proceeding was fundamentally unfair or unreliable." *Id.* at 369.

## C.  Deficient Performance Prong

On the deficient performance prong, we hold that trial counsel's investigation, preparation, and execution of their chosen insanity defense fell below an objective standard of

reasonableness. *See Strickland*, 466 U.S. at 687–88. Trial counsel made several distinct errors that constitute deficient performance in preparing and presenting the insanity defense. We address each in turn.

**1**

Trial counsel's most significant error was failing to call as a witness—or consult at all—Dr. Molde, the expert the trial court had appointed to assess Rogers's competency for trial and sanity at the time of the offenses.

Shane settled on an NGRI defense "[i]mmediately" upon her appointment in January 1981. When Shane first visited Rogers at the jail, she recognized his bizarre behavior as consistent with schizophrenia. Dr. Molde was appointed to evaluate Rogers to determine not only if he was competent to assist in his defense, but also to determine whether, on the date of the crime, Rogers "was in possession of mental capacities sufficient to distinguish between right and wrong and to comprehend the nature and quality of the acts with which he has been charged." At the competency hearing, Dr. Molde testified that Rogers "had signs and symptoms of paranoid schizophrenia," but he believed Rogers was competent at that time to proceed to trial. Dr. Molde also testified, however, that Rogers was probably not competent at the time of the offense or his arrest. Despite being aware of Dr. Molde's opinion on Rogers's competence at the time of the offense, trial counsel did not consult him in preparing Rogers's NGRI defense, nor did they call Dr. Molde to testify as a trial witness. At the evidentiary hearing before the district court, Shane testified that she did not talk to Dr. Molde about his testimony at any time after the competency hearing.

Trial counsel's decision not to consult or use Dr. Molde as a witness fell far below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687–88. The NGRI defense required the jury to apply the *M'Naghten* rule and determine whether Rogers "knew the nature and quality of [his] acts, had the capacity to determine right from wrong or knew whether [he] was doing wrong when [he] committed the crime." *Clark v. State*, 588 P.2d 1027, 1029 (Nev. 1979). Under the *M'Naghten* rule, the "ultimate issue" was not whether Rogers was schizophrenic, but whether that schizophrenia rendered him incapable of determining right from wrong at the time of the offense.

Because the jury had to determine legal sanity, trial counsel had no tactical reason not to ascertain Dr. Molde's opinion to see if it was consistent with his prior opinion that Rogers was not competent at the time of the offense. The State contends, on the other hand, that it was reasonable for trial counsel not to call Dr. Molde as a witness because trial counsel called Dr. Pauly, who opined that Rogers was legally insane at the time of the crime. Even if Dr. Molde would have been a better expert to select than Dr. Pauly, the State contends, "counsel['s] decisions regarding which witnesses to present is a strategic decision entitled to almost absolute deference." But deference is afforded only for "strategic choices made after thorough investigation of law and facts relevant to plausible options." *Hernandez v. Chappell*, 923 F.3d 544, 550 (9th Cir. 2019) (quoting *Strickland*, 466 U.S. at 690); *see also Lambright v. Schriro*, 490 F.3d 1103, 1120 (9th Cir. 2007) (per curiam) ("Only after a thorough investigation can a less than complete presentation of . . . evidence ever be deemed reasonable, and only to the extent that a reasonable strategy supports such a presentation."). Here, trial counsel made no strategic choice. Shane never spoke to Dr. Molde and admitted that she

simply "dropped the ball. I mean, he was there. He was already paid by the court. I should have brought him in because his opinion was consistent."

If counsel had consulted with Dr. Molde and then decided to present only Dr. Pauly on the insanity issue, such a decision might warrant traditional deference. But we do not give deference to counsel's choice of one expert over another when they did not investigate the choice and had no informed view on whether the testifying witness would be stronger than the non-testifying witness. *See Correll v. Ryan*, 539 F.3d 938, 949 (9th Cir. 2008) ("An uninformed strategy is not a reasoned strategy. It is, in fact, no strategy at all."); *see also Porter v. McCollum*, 558 U.S. 30, 39–40 (2009) (per curiam) (counsel ineffective for failing to "take the first step of interviewing witnesses" and "ignor[ing] pertinent avenues for investigation of which he should have been aware").

Furthermore, the failure to call Dr. Molde as a witness was deficient performance because Dr. Molde's testimony would have lacked deficiencies that existed with regard to other expert witnesses that trial counsel *did* decide to call.[4] First, Dr. Molde was a neutral, court-appointed expert,

---

[4] The State contends that it was reasonable for trial counsel not to call Dr. Molde because his testimony would have been "cumulative" to Dr. Pauly's. This argument conflates the *Strickland* deficient performance prong with the prejudice prong. We view counsel's performance at the time of counsel's conduct, and at the time counsel failed to consult Dr. Molde, they could not have known whether Dr. Molde's testimony would be cumulative and therefore could not have made a strategic choice not to call him for that reason. Whether Dr. Molde's testimony would have created "a reasonable probability" of different result at trial, on the other hand, is a question about *Strickland* prejudice. We address the prejudice prong in Section II.D.

whereas Dr. Pauly was hired by defense counsel. Second, the testimony Dr. Molde would have given at trial was consistent with his earlier testimony that Rogers was not competent at the time of the offense. Third, unlike Dr. Pauly, Dr. Molde had reviewed all the relevant records and had seen Rogers on more occasions than any of the mental health professionals to testify other than Dr. Gutride. Indeed—and in a very negative contrast—at trial, Dr. Pauly admitted that he came to his conclusion on insanity after spending only three-and-a-half hours with Rogers and without reviewing the Lake's Crossing daily progress notes. During closing arguments, the prosecutor emphasized Dr. Pauly's shortcomings as a witness:

> Again, all I can tell you, ladies and gentlemen, is that we had ten various psychiatrists who indicated that they had examined this defendant, trained psychiatric people, over a period of eight to ten months, appointed by the court, and we find *one man* that will come into the courtroom and give an opinion, *who will give an opinion at all*, with regards to whether at that time the defendant knew right from wrong.
>
> Do you know why that man is here?
>
> Well, he had an interest in being here.
>
> He was *hired especially by the defense* to come into this courtroom.

He was not court appointed as he indicated
. . . .[5]

Dr. Molde's testimony, on the other hand, would not have been vulnerable to such "hired gun" attacks, and with his testimony to bolster Dr. Pauly's, the prosecution could not have faulted Rogers for presenting only one expert on the ultimate issue. Because trial counsel's decisions about Dr. Molde cannot be explained as trial strategy, we hold that trial counsel performed deficiently in failing to consult Dr. Molde and to call him to testify.

## 2

Trial counsel's error in not consulting and calling Dr. Molde was compounded by the inadequate preparation of their chosen mental health experts: Drs. Pauly, Richnak, and Rich. We distinguish this error from trial counsel's threshold decision to use these experts to support the NGRI defense at all. The State misconstrues one of Rogers's arguments, stating that "the main thrust of the [district] court's conclusion is based on [trial counsel's] presentation of Rogers'[s] insanity defense through" these three experts, two of whom did not opine on the ultimate issue of insanity. But even if we assume that counsel had good reasons to call these experts and that their proposed testimony was likely to be helpful in some ways to Rogers, it does not excuse the lack of preparation once those experts were chosen.

---

[5] The dissent argues "[t]hat Dr. Pauly acknowledged being hired by defense counsel is a non-sequitur." Dissent at 79. Clearly, however, the prosecution believed that it was relevant that Dr. Pauly was hired by the defense.

We conclude that trial counsel's inadequate preparation of their mental health experts constitutes deficient performance.  To begin, trial counsel left Dr. Pauly too little time to prepare an opinion.  Although Shane settled on the NGRI defense immediately after her appointment, she and Bork did not begin preparing Dr. Pauly for his testimony—testimony on what Shane believed was Rogers's sole supported defense—until the month before trial.  Trial counsel has given no reason why they waited so long to contact Dr. Pauly, who was also the only expert they intended to ask about the ultimate issue of insanity.

Even after finally contacting Dr. Pauly, trial counsel did not provide him with documents that were essential to his testimony, and the documents they did provide were not adequately discussed with him.  We have repeatedly found trial counsel ineffective for failing to adequately prepare experts or provide them with sufficient "informational foundations."  *See, e.g.*, *Smith v. Stewart*, 189 F.3d 1004, 1012 (9th Cir. 1999) (holding that "[a] lawyer who should have known but does not inform his expert witnesses about essential information going to the heart of the defendant's case" was constitutionally ineffective).

Critically, Dr. Pauly never received the Lake's Crossing progress notes that detailed Rogers's daily conduct in the months leading up to trial, which contained "quite a bit" of information that supported his diagnosis of schizophrenia, even though trial counsel had access to them.  *See Caro v. Calderon*, 165 F.3d 1223, 1228 (9th Cir. 1999) (trial counsel ineffective where "counsel failed to provide those who did examine [the defendant] with the information that he had").  Shane admitted that not providing the daily progress notes to Dr. Pauly "was definitely a mistake."

Furthermore, trial counsel's failure to investigate Rogers's background to fully prepare their experts was objectively unreasonable.  Counsel in a capital case has an "obligation to conduct a thorough investigation of the defendant's background."  *Williams*, 529 U.S. at 396; *see also Porter*, 558 U.S. at 39 ("It is unquestioned that under the prevailing professional norms at the time of Porter's trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'" (quoting *Williams*, 529 U.S. at 396)); *Bean*, 163 F.3d at 1080 (trial counsel ineffective for failing to adequately investigate the case to provide informational foundations for mental health experts' conclusions).  This obligation is especially pertinent in preparing mental health experts, because any gaps in the experts' knowledge about the defendant will severely undercut the efficacy of the defense.  *See Brown v. Sternes*, 304 F.3d 677, 696 (7th Cir. 2002) ("[I]t is the imprecise and imperfect nature of the science known as psychiatry that makes a review of the past available psychiatric records *an essential part* of an evaluation of a defendant's competency . . . .").

Here, trial counsel did not investigate Rogers's childhood before trial despite wanting to do so and knowing such information would be important.  The NSPD had an in-house staff investigator, but trial counsel did not use him for Rogers's case.  Instead, trial counsel used an outside investigator who was unable to investigate Rogers's childhood in Ohio due to limited funding.[6]  The failure to investigate was significant because "[t]he entire theory of the

---

[6] After exhausting their investigative funds, counsel moved for additional funds for the penalty phase, but did not move for additional investigative funds for the guilt phase, *i.e.*, funds to support their NGRI defense.

prosecution was that [Rogers] was an actor" and thus a malingerer trying to escape criminal consequences. Establishing a historical foundation for Rogers's schizophrenia diagnosis was also essential because the State's expert was prepared to testify that Rogers was faking his symptoms to gain an advantage in the legal proceedings.

Trial counsel has provided no tactical reason for not developing the proper historical foundation. Making clear there was no supportive tactical reason, Shane acknowledged the need to corroborate Rogers's mental illness in childhood, stating that she "wanted to find out what had been going on with him at the time he was in Ohio at the onset of his schizophrenia." Trial counsel also knew that "criteria from the DSM Three"—on which the mental health experts who evaluated Rogers relied—required her "to show certain things starting with [Rogers] at a certain age."

For similar reasons, trial counsel performed below the required standard of competence by not ensuring that Drs. Rich and Richnak received and reviewed all relevant documents. Trial counsel did not ensure that either expert was provided the police reports detailing Rogers's bizarre behavior, and they did not discuss with them the Lake's Crossing daily progress notes or Dr. Gutride's reports. Shane did not recall a reason for not providing the police reports to Dr. Rich, especially because she gave them to Dr. Pauly. In fact, trial counsel could not recall "do[ing] *anything*" to prepare these experts for their testimony, and no entries in the case activity log indicate that they did so. Without this necessary information, Drs. Rich and Richnak were unable to provide a *full* picture of Rogers's purported

schizophrenia.[7] *See Wallace v. Stewart*, 184 F.3d 1112, 1118 (9th Cir. 1999) (finding counsel ineffective for not fulfilling "duty to seek out [evidence of the defendant's background] and bring it to the attention of the experts"); *see also Sternes*, 304 F.3d at 696–97 ("We think it is obvious that a psychiatrist's diagnosis, especially when dealing with a chronic schizophrenic, must necessarily rely heavily on the patient's past psychiatric history, family history, criminal activity, and medical records." (emphasis omitted)).

Even when trial counsel provided their experts with useful documents, they failed to adequately discuss those documents with the experts or discuss how the expert would respond to expected lines of inquiry on cross-examination. For example, trial counsel provided Dr. Pauly with the reports of other mental health professionals who had evaluated Rogers before trial and police reports detailing Rogers's behavior before and after the offense, but they never actually met with Dr. Pauly face-to-face or discussed those records with him. Trial counsel also never discussed with Dr. Pauly the reports from Lake's Crossing psychologist Martin Gutride, whose opinions contradicted

---

[7] The district court characterized Drs. Rich and Richnak's testimony as "mostly pointless, and worse . . . damaging to Rogers'[s] NGRI defense." We need not decide whether counsel's decision to present two experts who did not intend to opine on sanity was deficient because it was deficient to present them without consulting and calling Dr. Molde and providing them necessary and available documents. We agree with the State that a successful insanity defense requires counsel to educate the jury on the nature of mental illness, but the fact that these two witnesses may have helped the jury to understand why they believed Rogers was schizophrenic does not cure counsel's objectively unreasonable decisions to ignore Dr. Molde and fail to provide the requisite informational foundations for Drs. Rich and Richnak's testimony.

Dr. Pauly's conclusions, even though it would be an obvious line of expected prosecutorial attack on cross-examination.

Trial counsel also did not discuss the ultimate issue of insanity with either Dr. Rich or Dr. Richnak because they did not intend to ask the experts to opine on that issue.[8] Trial counsel offers no strategic justification for failing to at least discuss the issue with these experts before putting them on the stand. Without a discussion, trial counsel could not have known what the experts would say about the insanity issue on cross-examination. *See Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000) (finding trial counsel ineffective in presenting an expert in support of a diminished capacity defense but failing to ask that expert for an opinion on the ultimate issue before trial).

As Rogers's *Strickland* expert testified, the prevailing norms at the time of Rogers's trial required counsel to give their competency experts "everything you possibly could" because "you'd want them to be prepared to . . . render a reliable opinion." We conclude that trial counsel performed deficiently by not adequately preparing their experts, thereby

---

[8] The State appears to construe Rogers's argument as contending that Drs. Rich and Richnak were not useful witnesses because they could not opine on the ultimate issue of insanity. We acknowledge that some aspects of Drs. Rich and Richnak's testimony were useful to the defense, but emphasize that counsel performs deficiently when counsel fail to even *discuss* an issue with an expert that counsel knows will be the focal point of the cross-examination of those witnesses and the critical issue at trial. Indeed, the trial judge interrupted Dr. Richnak's direct examination to ask counsel when they would be asking for his opinion on whether Rogers was insane at the time of the offense. When informed that would not be the case, the State then objected to Dr. Richnak's testimony as having no bearing on the issues at trial.

undercutting the persuasiveness of the NGRI defense as demonstrated through expert testimony.

**3**

Trial counsel also performed deficiently by not preparing to rebut the State's mental health expert, Dr. Martin Gutride. Dr. Gutride was a psychologist at Lake's Crossing. At trial, called as the prosecution's rebuttal witness, he opined that Rogers was not schizophrenic or otherwise severely mentally ill; instead, Dr. Gutride diagnosed Rogers with ASPD. Dr. Gutride also testified to his concern that Rogers was malingering, *i.e.*, faking symptoms of schizophrenia to escape criminal consequences. These conclusions directly contradicted those of Dr. Pauly, who testified that Rogers was schizophrenic, and that his mental illness rendered him legally insane at the time of the offense. Thus, it was especially important for trial counsel to at least attempt to undermine Dr. Gutride's testimony because he examined Rogers numerous times over several months; this longevity is in stark contrast to the only expert the defense called to opine on the ultimate issue, Dr. Pauly, who admitted at trial that he only saw Rogers for a total of three-and-a-half hours.

We have held, as have our sister circuits, that trial counsel can be ineffective for failing to challenge a prosecution expert. *See Wood*, 64 F.3d at 1436, 1438 (affirming district court's conclusion that trial counsel was ineffective for failing to challenge qualifications and conclusions of prosecution ballistics expert); *see also Rivas v. Fischer*, 780 F.3d 529, 550 (2d Cir. 2015) (finding trial counsel ineffective in part for failing to adequately impeach a vulnerable State expert at guilt phase); *Couch v. Booker*, 632 F.3d 241, 247 (6th Cir. 2011) (finding trial counsel ineffective in part for failing to present expert testimony refuting the State's theory on cause of death).

Here, as the *Strickland* expert and the district court correctly pointed out, any reasonable defense attorney would have anticipated that the State would call Dr. Gutride based on his reports and his testimony at the competency hearing. Trial counsel should have known that they needed to prepare their witnesses to explain the basis for their disagreement with Dr. Gutride because trial counsel possessed the reports of the multiple psychiatrists who had disagreed with Dr. Gutride's conclusions—and his conclusions were extremely favorable to the prosecution. Shane admitted she knew at the time that Dr. Gutride's report was "very bad for our defense," and that she knew if the prosecution had harmful evidence, they would typically present it.

Even though rebuttal evidence was readily available, trial counsel did not adequately prepare their experts to rebut Dr. Gutride's testimony. First, trial counsel did not discuss Dr. Gutride's reports with Dr. Pauly. With adequate discussion, Dr. Pauly would have been better prepared to explain the basis not only for his disagreement with Dr. Gutride's diagnosis, but also to explain that Dr. Gutride did not have a sufficient basis for his conclusions. Specifically, pursuant to the DSM-III, Dr. Gutride lacked sufficient information to diagnose ASPD because an ASPD diagnosis requires records from the period before age 15. Also, it is medically insufficient to base a diagnosis of ASPD on the patient's self-reporting, although that is exactly what Dr. Gutride did. Trial counsel used the DSM-III to prepare for trial, so the information regarding an appropriate ASPD diagnosis was available to them.

Second, trial counsel did not prepare to impeach Dr. Gutride with the fact that it was accepted at the time of Rogers's trial that a diagnosis of schizophrenia preempts, or precludes, a diagnosis of ASPD. This information was

readily available in the ASPD section of the DSM-III. Acknowledging that she possessed this information, Shane testified that she had no reason for failing to prepare her experts to testify that a schizophrenia diagnosis preempts an ASPD diagnosis.  As Dr. Molde later testified at the evidentiary hearing before the district court, ASPD by definition requires a *normal* mental status examination.  The preemption line of questioning was important because Dr. Gutride diagnosed Rogers with ASPD, but his reports described symptoms consistent with schizophrenia, and therefore symptoms that were inconsistent with the normal mental status examination that ASPD requires.  Similarly, trial counsel did not effectively confront Dr. Gutride with evidence that supported a schizophrenia diagnosis and undermined a finding of malingering.  For example, although trial counsel asked Dr. Gutride about a report in which he indicated Rogers's affect was "bland," they did not confront Dr. Gutride with the evidence that numerous psychiatrists found abnormalities of perception and thought, flatness of affect, and looseness of thought—all characteristics of an abnormal mental status examination.  It was objectively unreasonable for trial counsel to not point out that Dr. Gutride himself observed symptoms of a mental illness that would preempt his own diagnosis.

The State's contention that trial counsel "preemptively undermined the credibility and findings of Dr. Gutride" is unpersuasive.  A prepared cross-examination is one of the most effective tools in a search for the truth.  *See* John Henry Wigmore, 5 Evidence in Trials at Common Law, § 1367, at 32 (J. Chadbourn ed. 1974) ("[C]ross-examination is . . . beyond any doubt the greatest legal engine ever invented for the discovery of truth.").  For this reason, trial counsel cannot discharge their duty to anticipate and rebut the State's expert merely by presenting their own expert with differing

views. This is especially true if the reason trial counsel was ill-prepared to effectively cross-examine the State's witness is because of inadequate investigation and preparation. *See Jones v. Ryan*, 1 F.4th 1179, 1192 (9th Cir. 2021) (finding trial counsel ineffective where the error was "based not on strategy, but on lack of preparation, which left counsel unaware of the importance of [the] evidence"); *Couch*, 632 F.3d at 247 (finding trial counsel ineffective for failing to take "simple steps" to prepare to rebut the State's causation evidence). Accordingly, we conclude that trial counsel performed deficiently by failing to adequately challenge Dr. Gutride.

**4**

Trial counsel's failure to explain the elements of the NGRI defense to the jury in their opening statement likewise fell below an objective standard of reasonableness.

The prosecution's opening statement informed the jury of the elements of the crimes charged, explaining that "[a]s you progress and we progress in this trial and as the witnesses testify it is important that you have some understanding as to what elements you may have to look for." After explaining the elements of first-degree murder, the prosecutor told the jury that these "elements" are like a "recipe or a chemical formula," and at the end of the trial the jury "can go through and check them off." Trial counsel for Rogers, on the other hand, did not tell the jury the elements of their insanity defense. The prosecution informed the jury that Rogers had entered a plea of NGRI and had the burden of proving that defense, but Rogers's counsel did not define legal insanity or tell the jury what elements the defense had the burden of proving. Thus, as Rogers points out, the jury was given context for how the evidence that would be presented related to the murder charge, but it was given

inadequate context for how the evidence would relate to the insanity defense.

Opening statements are essential to contextualize the evidence the jury will hear and to help the jury understand each side's theory of the case. For this reason, trial counsel admitted that their failure to explain the insanity defense at the outset was "a big mistake." Rogers's *Strickland* expert, Wiener, explained at the evidentiary hearing below why this omission was objectively unreasonable. He testified that due to the State's strong circumstantial evidence, "the possibility of avoiding a guilty verdict all fell on the insanity defense." But because Shane never discussed the definition of insanity that would be presented to the jury at the end of the trial, the jury "must have wondered why are we listening to all this stuff about is it paranoid schizophrenia or is it antisocial behavior or did he malinger or didn't he, did he fake, didn't he? Why are we listening to psychiatrists?" A reasonably competent defense attorney would have known that omitting the proper context to the most important question before the jury made the NGRI defense less likely to succeed.

## 5

Shane, as lead counsel for Rogers, knew that an NGRI verdict was the best, and only, defense strategy. Rogers and the State agree on appeal that there was strong evidence connecting Rogers to the murder scene. Given that it would be difficult for Rogers's defense counsel to seriously argue that he did not commit the murders, properly preparing and executing the NGRI defense was trial counsel's most important task. Trial counsel's failure to prepare their experts, provide them with critical documents, discuss the insanity issue with them before putting them on the stand, investigate Rogers's background to provide information to support its experts' diagnoses, explain the elements of the

insanity defense to the jury, and use readily available evidence to rebut the State's expert, all prevented Rogers from subjecting the State's case to "reliable adversarial testing." *Strickland*, 466 U.S. at 688.   Even granting Rogers's trial counsel the proper presumption of reasonableness under *Strickland*, we hold that Rogers's trial counsel performed deficiently.

## D.  Prejudice Prong

We next hold that Rogers has shown there was a reasonable probability that he would have received a more favorable outcome had trial counsel performed competently. *See id.* at 694.

### 1

The State's primary contention on appeal is that NGRI verdicts are "exceedingly rare" in Nevada.  The State bases its argument that there can be no prejudice around a factually similar case in which the defendant unsuccessfully asserted an insanity defense despite using Dr. Molde as an expert. We decline the State's invitation to subjectively determine what a particular jury in rural Nevada is likely to do.  Instead, we ask whether a reasonable juror impartially applying the totality of the evidence to the legal standards would be reasonably likely to find those standards met.  In *Strickland*, the Supreme Court stated that "[t]he assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.  It should not depend on the idiosyncra[s]ies of the particular decisionmaker, such as unusual propensities toward harshness or leniency." *Id.* at 695.  "[E]vidence about, for example, a particular judge's sentencing practices, should not be considered in the prejudice determination." *Id.*

In effect, the State asks us to look at Nevada juries' histories regarding a particular defense. This request is contrary to *Strickland*'s guidance, and more importantly, it ignores the fact that the evidence Rogers was insane at the time of his crime was especially compelling, and thus could have been more persuasive than the evidence in a comparable case. *Cf. Chappell*, 923 F.3d at 554 (finding no prejudice where counsel did not present diminished capacity evidence because the strength of defendant's intent "contrast[ed] sharply with the relatively weak" evidence on diminished capacity, which would have negated the requisite intent). The State points to the factual similarities in the comparator case, but the fact that the case was also a rural triple murder and used the same expert tells us little about the strength of the evidence that the comparator defendant did not know right from wrong at the time of that defendant's offense.

## 2

Focusing on what a reasonable, impartial juror would find compelling, we conclude there was a reasonable likelihood that Rogers's NGRI defense would have succeeded if trial counsel performed effectively. In analyzing *Strickland* prejudice, we "compare the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently." *Id.* at 551 (quoting *Clark v. Arnold*, 769 F.3d 711, 728 (9th Cir. 2014)). Here, trial counsel's deficiencies in failing to prepare their witnesses and failing to impeach or rebut the State's evidence pervaded the entire trial. *See Weaver v. Massachusetts*, 137 S. Ct. 1899, 1913 (2017) (suggesting that ineffective assistance is more likely to be shown where deficient performance "pervade[d] the whole trial"). Rogers's case for prejudice is bolstered by the fact that we

have identified multiple errors. "When an attorney has made a series of errors that prevents the proper presentation of a defense, it is appropriate to consider the cumulative impact of the errors in assessing prejudice." *Turner v. Duncan*, 158 F.3d 449, 457 (9th Cir. 1998); *see also Wood*, 64 F.3d at 14s39 ("By finding cumulative prejudice, we obviate the need to analyze the individual prejudicial effect of each deficiency.").

Due to trial counsel's ineffectiveness during opening statements, the jury was not told the legal standard for insanity or what precisely Rogers had to prove. As a result, the jury had little context for understanding the significance of the State's evidence of Rogers's bizarre behavior before and after the crime, or the defense evidence of mental illness.

The jury also heard from only a single defense witness, Dr. Pauly, who was willing and able to testify to whether Rogers was legally insane at the time of the offense.[9] The jury heard Dr. Pauly's opinion only after two mental health experts testified to being unable to render an opinion, despite being defense witnesses.[10] Exacerbating the fact that

---

[9] The dissent argues that "[t]he key missing *evidence*, as opposed to anything missing from the defense presentation, were facts from which a jury could conclude that Rogers didn't know that he was killing the Strodes or that killing them was wrong." Dissent at 95–96. This is belied by the record. Drs. Pauly and Molde directly opined that Rogers was insane at the time of the crime.

[10] Even if it were not constitutionally deficient for trial counsel to present two experts to opine that Rogers is schizophrenic without also asking those experts their opinion on legal sanity, it was prejudicial to inadequately prepare those experts. If Drs. Rich and Richnak had been adequately prepared, they would have had the same materials as Dr. Pauly and would have therefore had the tools to form an opinion on the ultimate issue. As Rogers's *Strickland* expert testified: "the only

Dr. Pauly was the only defense expert to testify to the ultimate issue, his testimony was subject to attack on several fronts. The jury heard Dr. Pauly admit that he only met with Rogers twice (for under four hours total), he was hired by defense counsel for his opinion, and he failed to review daily progress notes in rendering his opinion. *See Jones*, 1 F.4th at 1196–1201 (finding prejudice where trial counsel presented a mental health expert who spent four hours with the defendant instead of a mental health expert who spent an estimated 130 hours working on the defense case). Dr. Gutride's cross-examination even highlighted the fact that reading his reports, which summarized the daily progress notes, would not provide the same comprehensive information as the notes themselves.

---

reason [Drs. Rich and Richnak] couldn't express an opinion [on insanity] was [that] their only source of a possible opinion would have been from what Mr. Rogers told them. But there was so much other material available that didn't require Mr. Rogers to say anything about the event." If the two experts had been adequately prepared and still did not have an opinion on insanity or believed that Rogers was legally *sane* at the time of the offense, trial counsel could have presented fewer or different experts.

Alternatively, Drs. Rich and Richnak could have been prepared to testify in a way that did not contradict Dr. Pauly's conclusion that he had enough information to opine on insanity. Instead, both experts were forced to admit that they were unable to form an opinion because Rogers refused to discuss the crime, rather than explain that they had not been asked to draw such a conclusion. Moreover, Dr. Gutride, a state expert, testified that he too could not opine on insanity because he only saw Rogers the year after the crime was committed and it would have been a "tremendous leap" for him to draw a conclusion without "enough data available to [him] at the time of the crime." Thus, the jury was left to wonder why only one of the testifying mental health experts—and, conveniently, the hired defense expert—had enough data to draw a conclusion on Rogers's sanity.

The jury also heard Rogers's mother describe his violent and impulsive behavior growing up, but because counsel did not investigate Rogers's childhood or prepare their experts with that information, the defense experts were not prepared to place those behaviors in the proper context. If trial counsel had investigated Rogers's background, Dr. Pauly would have explained to the jury that Rogers's behavior in childhood was "quite typical of schizophrenia," as it represented "the prodromal stage of a disorder that evolves later that's called schizophrenia." This testimony would have bolstered Dr. Pauly's opinion that Rogers was schizophrenic and undermined Dr. Gutride's testimony that Rogers was malingering. *See United States v. Laureys*, 866 F.3d 432, 440 (D.C. Cir. 2017) (holding that counsel's failure to present expert testimony that would have "significantly bolstered" defense theory prejudiced the defendant).

Proper investigation also would have uncovered evidence of Rogers's mother drinking while pregnant and Rogers's childhood abuse, and Dr. Pauly would have testified that both are contributing factors to the development of schizophrenia. Courts have consistently held that evidence of a defendant's background is relevant and impactful to the defendant's mental state while committing a crime. *See Boyde v. California*, 494 U.S. 370, 382 (1990) ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, *may be less culpable than defendants who have no such excuse*." (quoting *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989))); *Jones*, 1 F.4th at 1200 ("We are persuaded that testimony explaining Jones's [childhood and upbringing] would have significantly impacted the overall

presentation of Jones's culpability with respect to his mental state[.]'").

Instead, the jury was able to pair Rogers's mother's testimony with Dr. Pauly's testimony that Rogers exhibited antisocial behaviors in adolescence and during the time he lived with his ex-roommate.  On direct examination, trial counsel asked Dr. Pauly about the prosecutor's reports that covered Rogers's background in Ohio without preparing him to talk about how those reports fit into his schizophrenia diagnosis.  Based on his review of the reports, Dr. Pauly testified that in Rogers's adolescence, he displayed antisocial behaviors, including incidents of theft and stabbing, and engaged in "heavy use" of drugs.  Although trial counsel had framed the question to ask about the early onset of Rogers's schizophrenia, Dr. Pauly equivocally stated, "the best I could say from [the evidence provided by the district attorney's reports regarding Rogers's adolescence] would be that his adolescence was marked by a good deal of antisocial behavior, fighting, and . . . a good deal of drug abuse."  Dr. Pauly then stated that he reviewed evidence from Rogers's ex-roommate that Rogers's behavior had been "erratic," characterized by "outbursts of anger," and Rogers had even thrown an ashtray into a television set.  Not only did Dr. Pauly not show the connection between the adolescent antisocial behaviors and his schizophrenia diagnosis (the "prodromal stage" connection), he also did not testify that his schizophrenia diagnosis preempts an ASPD diagnosis.  If Dr. Pauly had testified that his diagnosis of schizophrenia preempted any diagnosis of ASPD, the damage to the defense from Dr. Pauly's references to antisocial behavior would have been mitigated.

Finally, the jury heard from Dr. Gutride on rebuttal that Rogers may have been faking his psychotic symptoms and suffered from ASPD.  Because Dr. Gutride was the only rebuttal witness, he was the last witness to testify.  Due to trial counsel's ineffectiveness, the jury did not hear defense counsel impeach Dr. Gutride's conclusions or his credibility with readily available evidence.  *See supra*, Section II.C.3; *see also Pointer v. Texas*, 380 U.S. 400, 404 (1965) ("[P]robably no one, certainly no one experienced in the trial of lawsuits, would deny the value of cross-examination in exposing falsehood and bringing out the truth in the trial of a criminal case.").  Without an effective cross-examination, and because no expert had testified that an abnormal mental status examination preempts ASPD, the jury was left to choose between two seemingly plausible theories of Rogers's mental health.

## 3

On the other hand, if counsel had performed effectively, the jury would have heard the standard for legal insanity during opening arguments and would have been primed to consider the testimony of the mental health experts in the context of the defense's NGRI theory.  Perhaps most importantly, if trial counsel had contacted Dr. Molde and given him all the relevant documents, he would have confirmed Dr. Pauly's testimony that Rogers "did not know right from wrong or know the nature and quality of his act." Dr. Molde would have explained how the bystanders' descriptions of Rogers's behavior and his numerous examinations allowed him to reach the conclusion that Rogers was insane at the time of the offense.  He would have testified that Rogers had a "rock-solid" case for NGRI. Unlike Dr. Pauly, as a court-appointed expert, Dr. Molde would have been immune from the State's "hired gun"

attacks. He would have also been largely immune from attacks related to the amount of time spent with Rogers because Dr. Molde conducted more examinations of Rogers than any other psychiatrist or psychologist except for Dr. Gutride.

Properly prepared, Dr. Molde's testimony would have severely undercut the State's witnesses.[11] He would have testified that a diagnosis of ASPD "absolutely requires a normal mental status examination. There cannot be any abnormalities of perception or thought or there can't be any hallucinations or delusions, any flatness of affect, any looseness of thought, any of that stuff, because antisocial personality disorders by definition don't have any of that." Dr. Molde would have testified that "the record is replete with oddities of perception and thinking and delusional activity that [Rogers] had." He would have noted that "things like loose thought associations, concrete proverb interpretations, flat affect, a stare, suspicious behavior,

---

[11] Again, even if it was not deficient to call Drs. Rich and Richnak for the defense, presenting those experts *instead of* Dr. Molde was deficient and prejudicial. In contrast to the testimony Dr. Molde would have given, Drs. Rich and Richnak's testimony did little to further the insanity defense for two reasons. First, the opinions of these two experts lacked credibility because trial counsel did not provide them with the relevant historical records necessary to support their diagnosis, which the prosecutor highlighted during cross-examination. *See Sternes*, 304 F.3d at 696–97 (emphasizing that a psychiatrist's diagnosis of chronic schizophrenic must necessarily rely on defendant's background and records). Second, Drs. Rich and Richnak's opinions that Rogers was schizophrenic did not reach the ultimate question for the defense. Because they were unable to testify to the ultimate issue, and said as much on the stand, their opinions also could not prevent the prosecution from arguing that *only one* out of many mental health experts who examined Rogers were willing to say he was legally insane at the time of the murders.

thought-blocking, the grandiosity, odd comments, poverty of thought, posturing, doodling, food being poisoned . . . all that stuff is highly consistent with mental illness, schizophrenia in particular and not due to anything else."

This testimony would have been important because Dr. Gutride's reports described symptoms on Dr. Molde's list, including flat affect and paranoid ideations. In other words, if Dr. Molde's testimony about preemption had been presented and accepted, the jury would have had to believe that the multiple psychiatrists and psychologists who examined Rogers and found abnormalities of perception or thought, hallucinations or delusions, flatness of affect, or looseness of thought—including Dr. Gutride—were incorrect for Dr. Gutride's ASPD diagnosis to be medically valid under the DSM-III. Instead, Dr. Gutride's statement that paranoid ideation is "consistent with [paranoid schizophrenia] but also consistent with many other things" went unchallenged.

We reject the State's contention that Dr. Molde's testimony would have been merely "cumulative" to Dr. Pauly's testimony. Unlike Dr. Pauly, Dr. Molde would have testified that Dr. Gutride's ASPD diagnosis was invalid because he lacked sufficient historical information and observed traits of abnormal perception and thought that would preempt an ASPD diagnosis. Dr. Molde's proposed testimony would have been more persuasive than Dr. Pauly's because Dr. Molde was a neutral court-appointed expert who saw Rogers many more times than Dr. Pauly. Dr. Molde's testimony would have prevented the State from arguing that only "one man" was willing to testify that Rogers was insane at the time of the crime. And, in a battle of the experts, presenting two mental health experts to

bolster the defense theory would have been more compelling than one.  *See Laureys*, 866 F.3d at 440.[12]

If trial counsel had adequately prepared their experts, Dr. Pauly also would have been a more effective witness. Specifically, if trial counsel had discussed the DSM-III definition of ASPD with Dr. Pauly, he would have agreed with Dr. Molde that a schizophrenia diagnosis preempts an ASPD diagnosis.  If trial counsel had investigated and prepared Dr. Pauly with Rogers's adolescent behavior, he would have explained that behavior as emblematic of the prodromal stage of schizophrenia and not ASPD.  He would have stated that Rogers's mother drinking during pregnancy and Rogers's childhood trauma and abuse were contributing factors to the development of schizophrenia.  *See Jones*, 1 F.4th at 1200–01 (holding that defendant was prejudiced where trial counsel did not call an expert who could have provided testimony explaining the contributing factors to the defendant's cognitive dysfunction, including prenatal substance abuse).  If trial counsel had provided Dr. Pauly the

---

[12] The dissent repeatedly asserts that additional testimony by Drs. Rich, Richnak, and Molde would have been merely cumulative, citing *United States v. Schaflander*, 743 F.2d 714, 718 (9th Cir. 1984). *See* Dissent at 70, 85, 86.  In *Schaflander*, this Court held that the testimony of *twenty-eight* uncalled witnesses would have been cumulative of the *fifteen* defense witnesses called at trial.  *Id.* at 718.  The facts of this case are far different.  If Rogers had even one additional medical expert testify about the central point of his defense—whether he was insane at the time of the crime—he would have rebutted the prosecution's attack that the only person willing to testify that he was insane at the time of the crime was a hired gun.  Our conclusion is strengthened by the fact that we are engaged in a *de novo* review.  *See supra* Section II.A; *see also* Dissent at 62 n.11 (agreeing that review of Rogers's IAC claim is *de novo*).  Under *de novo* review, there was a reasonable probability that additional testimony by Drs. Rich, Richnak, and Molde would have led to a different outcome.

Lake's Crossing daily progress notes, those notes would have supported his schizophrenia diagnosis. For example, the notes provided evidence that Rogers cried when he could not get a blue "point sheet"—a document related to the institution's work program—instead of a pink one, and that he refused food only to later be found looking into the garbage. The notes also indicated that on the first day Rogers was at Lake's Crossing, his "movements were mechanical and robot-like." If Dr. Pauly had been prepared with the progress notes, he would not have had to admit on cross-examination that he did not review the notes, which he conceded could have been "of some value," and his credibility would not have been so undermined.

Although the State insists that Dr. Pauly explained his disagreement with Dr. Gutride, Dr. Pauly's testimony would have been significantly stronger with proper preparation. If trial counsel had discussed Dr. Gutride's reports with Dr. Pauly, Dr. Pauly would have testified that despite diagnosing malingering and ASPD, Dr. Gutride's reports actually described symptoms consistent with schizophrenia. Dr. Pauly would have testified that the malingering diagnosis did not follow from the symptoms described in Dr. Gutride's March 17 report, in which Dr. Gutride described flat affect and paranoid ideations. He would have testified that Dr. Gutride's diagnosis was undermined by other professionals' reports about Rogers's behavior. Dr. Pauly would have testified that the State's witnesses described behavior before the offense that was consistent with schizophrenia, such as paranoid and persecutory delusions. And he would have explained that Rogers had no reason to feign mental illness at the time those behaviors were witnessed, thereby undermining Dr. Gutride's conclusion of malingering. Dr. Pauly would also have explained that a proper ASPD diagnosis requires records

from the period before age 15, and that it is medically insufficient to base a diagnosis of ASPD on the patient's self-reporting, as Dr. Gutride did.  Dr. Pauly's assertions about what data is necessary to diagnose ASPD would have been supported by the DSM-III, which Dr. Gutride admitted to using to guide his diagnosis.

Had trial counsel adequately prepared to rebut Dr. Gutride's testimony, they could have impeached him with the fact that under the DSM-III he "lacked sufficient evidence to make th[e] diagnosis" of ASPD.  Trial counsel would also have pointed out internal inconsistencies in Dr. Gutride's reports, his lack of experience in diagnosing malingering, the daily progress notes that undermined his conclusions, and the evidence the State itself presented regarding Rogers's behavior before the offense that undermined a malingering finding.  Trial counsel would have challenged Dr. Gutride's assertion that schizophrenia and ASPD are not necessarily inconsistent with the information in the DSM-III about preemption.

In the end, the dissent's prejudice analysis (conducted *de novo*, with no deference to the state proceedings) rests on the assumption that presenting the unequivocal opinion of a state-employed psychiatrist not hired by the defense, who examined Rogers close to the time of the events in question and concluded that Rogers was insane, could not have led a single reasonable juror to arrive at a different verdict, despite the fact that the only expert evidence offered by the State on insanity was the opinion of a state psychologist who examined the defendant months later, and the State made much of the fact in summation that the only defense expert who testified was a hired gun.  That analysis erroneously conflates an individual judge's subjective *post-hoc* speculation about what verdict the jury would actually reach

with the required *Strickland* analysis, which requires only a "reasonable probability" of a different result.

We reiterate that for Rogers to meet his burden on *Strickland*'s prejudice prong, he need not show that absent trial counsel's errors the NGRI defense would have definitely succeeded. Rather, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The prejudice prong thus "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart*, 506 U.S. at 372. Here, in a case turning on a battle of the experts, trial counsel's failure to reasonably choose which experts to call, investigate Rogers's history, prepare their experts, and rebut the State's expert undermines our confidence in the outcome of the trial. Applying *de novo* review, we conclude that Rogers has shown there was a reasonable probability of a more favorable outcome if trial counsel had performed effectively.

### E.  Institutional Obstacles

Although trial counsel's performance was replete with errors, we emphasize that the State's staffing and funding of Rogers's case contributed to those errors. Virginia Shane became lead trial counsel for Rogers's capital case in January 1981, just four months after she passed the Nevada bar exam. Shane worked at the Winnemucca office of the NSPD, a satellite of the main NSPD office in Carson City. There was only one other attorney in Shane's office from October to December 1980, before preparation began for Rogers's trial, and Shane had little contact with attorneys in other NSPD offices.

Shane had been practicing for less than a year when Rogers's trial was held in 1981.  Despite this, she received little to no guidance in preparing for Rogers's trial—a trial in which he faced the death penalty.  Although Robert Bork was subsequently staffed on the case, the record shows that Bork did not begin assisting Shane until August 1981, shortly before trial.  Shane decided on and began preparing the NGRI defense herself despite never having presented an NGRI defense before Rogers's trial.  She was tasked with choosing and preparing mental health experts, but she admitted that she did not know the difference between the various categories of mental health experts from which to choose.

Shane's office—and the NSPD's office generally—was overburdened and understaffed.  Although the American Bar Association recommends an attorney's caseload not exceed 35 to 50 cases, her caseload "was always upwards of 80."[13] Shane testified that she did not use NSPD's in-house investigator in Rogers's case, and that it was likely because he was the only public defender investigator for the whole

---

[13] One leading criminal procedure scholar has noted that "[s]tudies repeatedly reveal that indigent defense delivery systems are woefully underfunded and accordingly staffed by defense attorneys who often lack adequate training or supervision and whose caseloads are impossible for any attorney to manage effectively."  Eve Brensike Primus, *Disaggregating Ineffective Assistance of Counsel Doctrine: Four Forms of Constitutional Ineffectiveness*, 72 STAN. L. REV. 1581, 1612 (2020). Professor Primus contends that in cases involving systemic institutional failure, ineffectiveness may be so "structural and pervasive" as to constructively deny a defendant their Sixth Amendment right to effective assistance of counsel. *Id.* at 1594 (citing *Powell v. Alabama*, 287 U.S. 45, 53–56, 68–71 (1932)).  The Supreme Court has similarly expressed concern with the structural problems in state indigent defense delivery systems. *Id.* at 1619 (citing *Luis v. United States*, 136 S. Ct. 1083, 1087, 1095 (2016) (plurality op.)).

state outside of Clark and Washoe Counties. Then, when Shane was forced to turn to an outside investigator, the court granted only $3,000 in funding, consistent with the limit prescribed by state law. Shane knew that she needed further investigation into Rogers's background in Ohio, but the court denied her request for additional funds for the penalty phase.

Given these systemic obstacles, it is clear that we should not resolve this case merely by pointing out that counsel have fallen on their own sword in admitting inadequate performance, but rather should note a caution to the state government that should have adequately trained and staffed the case. Although we rest our holding on *Strickland*, we are troubled by the adequacy of the representation in Rogers's case due at least in part to factors outside of trial counsel's personal control. If, as we believe, the right-to-counsel guarantee is meant to ensure that our adversarial system reliably tests the prosecution's case before subjecting a defendant to incarceration—and here, death—states and municipalities providing defense in serious criminal cases should ensure that advocates have the means to do so.

## III

We finally address the State's contention that "the district court abused its discretion in fashioning relief for Rogers" because "the federal court has the power of release, but it has no other power." After finding Rogers's trial counsel ineffective, the district court conditionally granted the writ with instructions for the State to either, "(1) within 90 days from the date of this order, vacate [Rogers's] judgment of conviction and adjudge him [NGRI], and adjust his custody accordingly, consistent with Nevada law, or (2) within 90 days from the date of this order, file a notice of the State's intent to grant [Rogers] a new trial, and, within

180 days from the date of this order, commence jury selection in the new trial." We conclude that the district court did not abuse its discretion in fashioning relief for Rogers.[14]

A reviewing "court has broad discretion in conditioning a judgment granting habeas relief." *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987). Indeed, "[f]ederal courts are authorized, under 28 U.S.C. § 2243, to dispose of habeas corpus matters 'as law and justice require.'" *Id.* "Sixth Amendment remedies should be 'tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests.'" *Lafler v. Cooper*, 566 U.S. 156, 170 (2012) (quoting *United States v. Morrison*, 449 U.S. 361, 364 (1981)). For instance, in *Murtishaw v. Woodford*, we held that an erroneous jury instruction constituted constitutional error that could not be deemed harmless. 255 F.3d 926, 974 (9th Cir. 2001). As for remedy, we reversed the district court's denial of the habeas petition with regard to the defendant's death sentence and remanded "to the district court with instructions to grant the writ to the extent that the death penalty sentence is vacated and a sentence of life imprisonment without parole is substituted unless the State resentences him within a reasonable time." *Id.*

Similarly, here, the district court gave the State the option to adjudge Rogers NGRI, thereby preserving state resources, or retry him. Thus, contrary to the State's contention, the district court did not "compel" the State to

---

[14] Despite arguing that federal courts have only one power in granting a habeas petition—release—the State does not want the option to release Rogers. The State also does not challenge the aspect of the district court's conditional writ that provided an opportunity for retrial.

adjudicate Rogers NGRI—if the State does not want to adjudicate him NGRI, it is free to retry him.  The relief ordered is narrowly tailored to address the ineffective assistance of counsel without awarding Rogers an unwarranted windfall.  Giving due consideration to the district court's broad discretion in granting conditional habeas relief, we hold that the district court did not abuse its discretion.[15]

---

[15] The dissent in its footnote 16 unleashes a range of contentions primarily by its own assertions.  For example, the dissent says that it doesn't "see how defense counsel discussing legal requirements for insanity, along with highlighting some of the evidence . . . , would have even benefitted Rogers," with the dissent's theory being that discussing legal requirements for the NGRI defense "might have been off-putting in the opening or might have predisposed the jury *against* Rogers."  *See* Dissent at 66 n.16.  But that theory negates the value of opening argument on any case where a defense of NGRI is permissible and the elements of a defense should be specified to give the best chance that a jury will understand the context for the evidence to be presented at trial.

Strangely, the dissent also contends that, because it is clear that "Rogers brutally murdered three innocent people," the "evidence of both his guilt and sanity was overwhelming."  Dissent at 100.  But the fact that Rogers killed the victims, even if clearly established, does not establish that evidence of "his *sanity* was overwhelming."  Wholly apart from the expert opinions, the jury heard that  Rogers told Hartshorn that he lived in a pyramid and that "Somebody is shooting rockets off of Mount Olympus and one of these days it will hit my pyramid and blow me up"; told Canadian authorities that he was "Emperor of North America"; and, when arrested in Florida, had been standing on the bumper and hanging on to the luggage rack of a station wagon driving down the highway.  *See supra* pp. 6–8.

The dissent doesn't adequately explain why it concludes that the evidence of sanity was "overwhelming."  To be sure, Rogers killed his victims in calculated and cold-blooded ways and persistently attempted to avoid capture, including fleeing to the Canadian border.  But these

## IV

For the foregoing reasons, we affirm the district court's grant of Rogers's habeas petition based on his ineffective assistance of counsel claim. The deficiency of counsel prejudiced Rogers because a better result was reasonably probable had there been a competent presentation by the defense, and the error was not harmless because there was a substantial and injurious effect or influence of the IAC in determining the jury verdict. *See O'Neal v McAninch*, 513 U.S. 432, 436 (1995).

**AFFIRMED.**

---

HURWITZ, Circuit Judge, concurring:

I join Judge Gould's opinion in full and have also filed a separate statement in which Judges Gould and Bennett concur.

---

Separate statement of HURWITZ, Circuit Judge, joined by GOULD and BENNETT, Circuit Judges:

I write separately to emphasize a point Judge Gould makes in his majority opinion—that the difficult issues we

---

actions of Rogers are consistent with insanity. The methodical actions of a killer in a delusional state who does not know right from wrong do not prevent satisfying the standard *M'Naghten* definition of insanity. The critical issue is whether Rogers knew the difference between right and wrong at the time of the murders, not whether he acted in an entirely bizarre or plainly methodical manner.

confront today might have been avoided had Nevada paid sufficient attention to the appointment of qualified capital counsel.

I do not doubt that appointed defense counsel tried their best and were fully competent to try noncapital cases. But capital defense is not simply routine criminal defense with higher stakes. Rather, as the Supreme Court aptly put it, "death is different." *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) (plurality op.). It is indisputably the "most challenging aspect of criminal defense." Larry Hammond & Robin M. Maher, *The ABA Guidelines: The Arizona Experience*, 47 HOFSTRA L. REV. 137, 138 (2018). The American Bar Association long ago recognized this, enacting detailed *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*. And the Supreme Court, while not treating the Guidelines as mandatory, has emphasized their usefulness in evaluating the adequacy of capital defense counsel's performance. *See Bobby v. Van Hook*, 558 U.S. 4, 8 (2009); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003).

Rogers nonetheless went on trial for his life defended by two relatively inexperienced and overworked lawyers. Their appointments would not have passed muster under the ABA Guidelines. Neither had tried a capital case, presented an insanity defense, or received any specialized training in capital defense. *See* Am. Bar Ass'n, *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 HOFSTRA L. REV. 913, 961–62, 976–77 (2003) (Guidelines 5.1, 8.1). And both retained oppressive workloads during this assignment, with each responsible for up to eighty other cases in the time leading up to Rogers' trial. *Id.* at 965 (Guideline 6.1). Had Nevada paid sufficient attention to counsel's qualifications and workloads, most of

what counsel acknowledge as errors in handling this case would have been avoided.

Since this case was tried, Nevada has taken steps to address the adequacy of capital representation. The Nevada Supreme Court now presumptively requires that lead counsel in a capital case have "(1) acted as lead defense counsel in five felony trials, including one murder trial, tried to completion (i.e., to a verdict or a hung jury); (2) acted as defense co-counsel in one death penalty trial tried to completion; and (3) been licensed to practice law at least three years." *See* Nev. Sup. Ct. Rule 250(2)(b). The Nevada Supreme Court has also adopted detailed, if non-binding, standards for counsel in capital cases that appear to be consistent with the ABA Guidelines. *See* Supreme Court of the State of Nevada, ADKT No. 411, Order (Oct. 16, 2008).

But it remains as true today as it was at the time Rogers was tried that if a State chooses to impose capital punishment, it has the obligation to provide experienced defense counsel with the ability, resources, and time to handle life and death matters. "The process of sorting out who is most deserving of society's ultimate punishment does not work when the most fundamental component of the adversary system, competent representation by counsel, is missing." Stephen B. Bright, *Counsel for the Poor: The Death Sentence Not for the Worst Crime but for the Worst Lawyer*, 103 YALE L.J. 1835, 1837 (1994).

Far too often our court sees defective performance in capital cases from trial counsel confronting the death penalty for the first time. *See, e.g.*, *Elmore v. Sinclair*, 799 F.3d 1238 (9th Cir. 2015); *Hamilton v. Ayers*, 583 F.3d 1100 (9th Cir. 2009). This is a highly specialized area of the law, and if a State believes it is important to have a death penalty, it must provide counsel competent to provide an effective defense,

both as to guilt and penalty. We are here today not only because of counsel's representation, but also because Nevada failed to honor its obligation to provide competent *capital* counsel. This case serves as a continuing caution of the consequences of such a failure, both for parties and victims of crime.

BENNETT, Circuit Judge, dissenting:

As the majority explains, our law requires a petitioner seeking a writ of habeas corpus based on ineffective assistance of counsel to show two things: (1) that counsel's representation was deficient, meaning it "fell below an objective standard of reasonableness"; and (2) that such deficiency was "prejudicial to the defense," meaning it created "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 692, 694 (1984).

The majority characterizes Mark Rogers's 1980 Nevada triple murder trial as a battle of the experts. In its view, the search for "cumulative prejudice" centers on the testimony of one expert who defense counsel failed to call as a witness and other experts who defense counsel should have better prepared. *E.g.*, *Harris ex rel. Ramseyer v. Wood*, 64 F.3d 1432, 1439 (9th Cir. 1995). That narrative, however, obscures reality. I agree that Nevada failed Rogers in allowing such inexperienced counsel to defend him in a capital case. But the facts left little room for masterful counsel, much less merely adequate counsel, to have proven that Rogers was legally insane when he committed the killings. Even considered together, the alleged errors identified by the majority did not prejudice Rogers's

defense. I therefore respectfully dissent from the majority's affirmance of the district court's issuance of the writ.[1]

## I. Factual Background

On December 2, 1980, Emery and Mary Strode and their disabled daughter Meriam Strode Treadwell were murdered in their home near Majuba Mountain, Nevada. *Rogers v. State*, 705 P.2d 664, 667, 672 (Nev. 1985) (per curiam). Emery, seventy-one, was shot three times and stabbed twice with a knife left in his chest. *Id.* at 667. Mary, seventy-two, was stabbed in the back and shot in the chest.[2] *Id.* Meriam, forty-one, was shot in the back, her wrists bound with an electric cord.[3] *Id.* Frank Strode, Emery and Mary's son and

---

[1] Although I dissent from the majority's affirmance of the grant of habeas relief (and would grant Rogers no relief), I agree with the majority about the *form* of the relief it allows: Nevada may either adjudge Rogers not guilty by reason of insanity or retry him. Majority Op. at 49. I join the majority in rejecting Nevada's argument that the district court lacked the power to order that form of relief.

[2] The prosecutor told the jury in closing, based on the forensic evidence and testimony: "This knife was driven by the defendant to its very hilt breaking through two ribs of Mrs. Strode with tremendous force and at the same time that knife had to be drawn back out" with such "great force" that her blood reached the ceiling. "But, as she was close to death the pathologist testified she was shot approximately no more than a foot away."

[3] The prosecutor argued: "Meriam was executed. She wasn't merely shot. Meriam, this feeble woman, . . . had a gun put up against her back[,] either touching or so very close it might as well have been touching as she was shot through the back. Simply said she was executed. There are no other words for it." Meriam's sister-in-law, Linda Strode, noted Meriam's various ailments: She suffered from diabetes since age eight, had only one eye with limited vision, had her pituitary removed, had brittle bones from her use of cortisone, almost always used a cane and also had a wheelchair and walker, and slept in a hospital bed.

Meriam's brother, and his wife, Linda, discovered the bodies the next day.

The evidence pointed only to Mark Rogers, who was twenty-three, the murderer. Rogers was an aspiring actor living in Los Angeles. A few weeks before Thanksgiving in 1980, Rogers visited friends in nearby San Bernardino. Before Thanksgiving, while in San Bernardino, Rogers called his roommate, Doug Morrison, to ask about a friend of Morrison's who lived in Denver, Colorado. Rogers planned to pursue his performing (acting, singing, and dancing) career there. Rogers called Morrison again at 8:00 a.m. on December 1, the day before the murders, this time from a payphone in Wells, Nevada. Rogers said that he wanted to return to Los Angeles and pursue his career there. He sounded normal during the call.[4] That afternoon, Rogers caught a ride bringing him from Winnemucca to Imlay, Nevada, about thirty-five miles closer to the murder scene. *See id.*

Rogers continued hitchhiking the next day, when the murders occurred. That day, "between approximately 12:15 and 12:45 p.m.," a geologist working nearby offered Rogers a ride, gave him a can of Seven-Up to drink, and dropped him off at the Strode residence. *Id.* Later, authorities lifted Rogers's fingerprints "from various items in the Strode residence, including a Seven-Up can and a glass jar found in the bedroom under the blanket with the victims' bodies." *Id.* at 668. Among the other items with Rogers's prints were a plate of beans, a cup of coffee, a sugar jar, a creamer jar, and a dirty coffee pot on the stove. The Strode property included

---

[4] Morrison did not describe any erratic behavior by Rogers during the time they were roommates. He only noted that Rogers had a few angry outbursts, discussed below, which he did not view as alarming.

a sign announcing that it was protected by Winchester, presumably referring to the rifle company. Other signs in the home reflected the Strodes' belief in their right to keep and bear arms in self-defense. And there was at least one shotgun stored inside.

The prosecution offered a theory of the murder sequence based on various facts no longer disputed in this habeas appeal.[5] When Rogers arrived at the Strode residence, there was no smoke coming from the chimney of the residence, contrary to the family's usual practice on cold days. The prosecution argued that this showed that the Strodes were not home. Rogers then, according to the prosecution, entered the Strodes' home and fed himself, preparing a plate of beans and coffee. The Strodes returned home while Rogers was still there. At some point soon after, Rogers stabbed Mary in the back before stabbing Emery in the chest. Next, as the prosecution told it, Rogers shot Emery twice. As Mary neared death, Rogers shot her from no more than a foot away. Rogers then shot Emery in the back. He also shot Meriam at point blank range through the back. Rogers then cut the cord off an electric drill, tied it around Meriam's arm, dragged her body, and dumped it on top of the bodies of her mother and father. Rogers then placed bed covers over the bodies. The final entries in Emery and Meriam's daily diaries were dated the morning they were murdered, and a pocket watch found in Emery's shirt pocket and

---

[5] At trial, defense counsel advanced a merits defense as well as an insanity defense. As Rogers claimed to have no memory of the events, defense counsel were likely unable to obtain his permission to abandon a merits defense. The record is silent on this issue, and Rogers has never advanced this as a habeas claim.

damaged by a bullet stopped at 1:00 p.m.  *Id.* at 667.  No
guns were found.[6]

Evidence also revealed Rogers's flight after he killed the
Strodes.  The plate of beans was left partially eaten and the
cup of coffee partially drunk.  "Between 12:30 and 2 p.m.
that same day," a man driving a blue truck fired shots at a
mechanic driving on a road near the murder scene.[7]  *Id.*  That
afternoon, "between 3:30 and 4 p.m.," a highway
maintenance worker gave Rogers a ride after seeing him on
the side of the road having run out of gasoline.  *Id.*  And
Rogers was spotted speeding in the Strodes' blue truck after
that.[8]  *Id.*  Along with the murders, Rogers was convicted of
stealing the Strodes' blue truck.

Rogers's flight from the murders also included an
international border crossing.  Rogers was seen next at the
Canadian border three days later.  That day, about ten to
twelve miles from the border in Washington state,
authorities recovered the Strodes' truck after it had been in
an accident during a blizzard.  Rogers then tried to cross into
Canada on foot.  He explained to border security that he was
headed to a nearby town and then to Quebec, where he hoped
to work as an entertainer and a singer.  But he was denied
entry because he lacked the proper employment visa.  At one
point, Rogers expressed a desire to seek political asylum in

---

[6] The prosecutor argued: "If the defendant didn't know that killing
these people was wrong, why would he take the guns?"

[7] The prosecutor argued: "Why was he shot at?  It was because the
defendant had just left the home of the Strodes and he was afraid
someone had discovered his crimes."

[8] The prosecutor argued: "[H]e peel[ed] out of there in a way that
indicate[d] that he was in an awful hurry to be leaving."

Canada, though he claimed to be a Canadian citizen at another point. He also told border security that he was the emperor of North America and that the FBI and the mafia were after him. Within a month, Rogers made it to Montreal. While in Montreal, Rogers called his roommate, Morrison. This call, as well, was normal.[9]

About a month after the murders, on January 4, 1981, Rogers was arrested in Florida for soliciting a ride on an interstate. He had been standing on the bumper of a vehicle, holding onto the luggage rack. He told the trooper who arrested him that he was standing on the bumper because two men who had shot at him were after him. At the county jail, law enforcement recognized that Rogers was wanted in Nevada. They told Rogers that they would not question him about the charges but would "advise him about the warrants lodged against him" and "talk to him about a possible waiver of extradition." With no question to prompt him, Rogers then "made a statement that he had done it in self-defense."[10]

Rogers was charged with three counts of first-degree murder, attempted murder (for shooting at the mechanic), and grand larceny (for stealing the Strodes' truck). *Id.* at 668. He went to trial claiming not to remember the events

---

[9] The prosecutor argued: "Isn't it strange how he always can recall the telephone number of Mr. Morrison and every time he talks to Mr. Morrison everything is coherent and fine."

[10] The prosecutor argued: "He said, 'I did it in self-defense.' . . . [A]fter being informed of the charges against him that he was wanted in Nevada for the murder of three people . . . he said, 'I did it in self defense.' . . . [T]his is not one person but two different people that he told this to, one clear across the country, and he made the same statement, 'I did it in self-defense.'" . . . There is no self-defense in any of the bodies that were found. Those bodies weren't killed in self-defense. But . . . the defendant recognized and knew that he had committed the acts."

of those months.   After deliberating for less than seven hours, the jury returned guilty verdicts on all charges.   After deliberating another four-and-a-half hours, the jury found two aggravating circumstances: First, that the murders were committed by a person who was previously convicted of a felony involving the use or threat of violence to the person of another.   And second, that the murders involved torture, depravity of mind, or mutilation of the victims.   The jury also found insufficient mitigating circumstances to outweigh the aggravating circumstances.   And so it imposed a death sentence for each of the three first-degree murders.

## II.  Discussion

The evidence was overwhelming that Rogers murdered the Strodes.   His counsel, an overworked public defender who had been a lawyer for only four months and had never handled a capital case, immediately decided to pursue a not guilty by reason of insanity ("NGRI") defense.   Another public defender joined the team about three months before trial.   He had never handled a capital case and had never put on an NGRI defense.

A group of mental health professionals participated in the case.   Rogers's defense team hired Dr. Ira Pauly, a board-certified psychiatrist, and the chair of the Department of Psychiatry at the University of Nevada School of Medicine, to assist in the defense.   The prosecution called Dr. Martin Gutride, a psychologist at a State facility, Lake's Crossing Center for Mentally Disordered Offenders ("Lake's Crossing"), as its expert witness in rebutting the NGRI affirmative defense.    The trial court appointed three psychiatrists to assess Rogers.   Dr. Phillip Rich, a private practitioner and faculty member of the University of Nevada School of Medicine who did evaluations at Lake's Crossing, was appointed to assess Rogers's competency to stand trial.

Dr. Louis Richnak, the medical director at Lake's Crossing, was also appointed to assess competency. And Dr. Donald Molde, a private practitioner who had worked as a psychiatrist for the Nevada Department of Prisons, was appointed to assess competency and to assist in Rogers's defense.

The majority identifies five primary deficiencies in trial counsel's representation that it claims prejudiced Rogers's NGRI defense: (1) counsel's failure to explain the elements of the NGRI defense to the jury in their opening statement; (2) counsel's inadequate preparation of Drs. Rich and Richnak to testify on the ultimate issue of Rogers's sanity when he killed the Strodes; (3) counsel's inadequate preparation of Dr. Pauly by failing to provide him the daily progress notes from Lake's Crossing or to investigate Rogers's background; (4) counsel's failure to call or consult Dr. Molde as a potential expert witness; and (5) counsel's failure to rebut the State's mental health expert, Dr. Gutride. Majority Op. at 35–46. In assessing the cumulative effect of these alleged errors, the majority concludes that "[h]ere, in a case turning on a battle of the experts, trial counsel's failure to reasonably choose which experts to call, investigate Rogers's history, prepare their experts, and rebut the State's expert undermines our confidence in the outcome of the trial." *Id.* at 46.

I disagree. Only the failure to call Dr. Molde as an expert witness was deficient under *Strickland*. "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one" under which courts ask "whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011)

(quoting *Strickland*, 466 U.S. at 690).  The rest of counsel's alleged errors do not show such incompetence.[11]

Yet even under the majority's assessment that counsel's performance was more broadly deficient, the majority materially overstates the impact on Rogers's case.  To assess prejudice, courts ask "whether it is 'reasonably likely' the result would have been different."  *Id.* at 111 (quoting *Strickland*, 466 U.S. at 696).  The question is not whether the court is "certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Id.*  Instead, in all but "the rarest case," the prejudice showing is functionally indistinguishable from "a showing that counsel's actions 'more likely than not altered the

---

[11] I join the majority in reviewing Rogers's ineffective assistance of counsel claim here *de novo*.  *See* Majority Op. at 15–17.  The Supreme Court of Nevada concluded in 1987 that "Rogers [had] failed to show that his counsels' performance was unreasonable or that it prejudiced him."  Even so, the district court found that new factual allegations "fundamentally altered" Rogers's claim from the one he presented in state court, meaning that the Supreme Court of Nevada never adjudicated it on the merits and so it is procedurally defaulted.  *See Dickens v. Ryan*, 740 F.3d 1302, 1319 (9th Cir. 2014) (en banc).  The district court also found that Rogers overcame that procedural default because his state post-conviction counsel was ineffective.  *See Martinez v. Ryan*, 566 U.S. 1, 14 (2012).  It therefore reviewed the merits of the claim *de novo*.  *See Atwood v. Ryan*, 870 F.3d 1033, 1060 n.22 (9th Cir. 2017).  Nevada does not challenge the district court's decision not to apply Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), deference to the state court's adjudication of Rogers's ineffective assistance of counsel claim.  *See* Oral Argument at 1:53–2:02 ("Q: I think we all agree that because of the history of this case, our review is not constrained by AEDPA deference.  Do you agree?  A: That's correct.").  And we have no duty to consider procedural default, and the attendant question of AEDPA deference, *sua sponte*.  *See, e.g.*, *Vang v. Nevada*, 329 F.3d 1069, 1073 (9th Cir. 2003).

outcome.'" *Id.* at 111–12 (quoting *Strickland*, 466 U.S. at 693, 697). As a result, "[t]he likelihood of a different result must be substantial, not just conceivable." *Id.* at 112. In making this assessment, courts must "compare the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently." *Hernandez v. Chappell*, 923 F.3d 544, 551 (9th Cir. 2019) (citation omitted).

Rogers was not prejudiced by counsel's performance. Although defense counsel could have done a better job, even a better presentation of the NGRI defense would have been very unlikely to succeed. "Under Nevada law, insanity is an affirmative defense which the presumedly sane defendant must prove by a preponderance of the evidence." *Ford v. State*, 717 P.2d 27, 33 (Nev. 1986). The inquiry looks at a defendant's sanity when the offense is committed. *Id.* As for the content of the defense, Nevada applies the *M'Naghten* rule, under which a defendant can rebut the presumption of sanity only by showing that he did not understand "the nature and quality of [his] acts," had no "capacity to determine right from wrong," or did not know "whether [he] was doing wrong when [he] committed the crime."[12] *Clark v. State*, 588 P.2d 1027, 1029 (Nev. 1979). Under this test, "[l]egal insanity is not circumscribed in meaning or purpose by medical criteria concerning human psychosis," and so "[t]he presumption of sanity is not rebutted merely by a history of prior institutional

---

[12] The jury was instructed: "[I]f you find that the defendant was not capable of knowing or understanding the nature and quality of his act, you will find that he was legally insane or, if you find that he was incapable of knowing or understanding that his acts were wrong, you will find that he was legally insane."

commitments or diagnoses of mental deficiency or derangement." *Ford*, 717 P.2d at 33.

Even a perfectly presented insanity defense, with additional and better prepared experts,[13] would have been unlikely to rebut the presumption that Rogers was sane. The sequence of Rogers's actions preceding, during, and after the killings confirmed that he understood he was killing the Strodes and that he understood that killing the Strodes was wrong. Yet in granting habeas relief, the district court hardly engaged with the evidence the prosecution presented or the strength of its case.[14]

The jury rejected the NGRI defense and convicted Rogers as charged: three counts of first-degree murder in addition to attempted murder and grand larceny. In following the court's instructions, the jury necessarily found, beyond a reasonable doubt, that each of the three killings "was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill which was the result of

---

[13] At trial, defense counsel called Drs. Rich and Richnak to testify that Rogers suffered from schizophrenia and Dr. Pauly to testify that Rogers was schizophrenic and legally insane at the time of the offense.

[14] The majority misunderstands the significance of the prosecution's evidence and the strength of its case. The State, from start to finish, has argued both that there was no ineffective assistance, *and* that there was no prejudice *because* of the significance of the prosecution's evidence and the strength of its case. And, of course, the district court must compare "the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently" in light of the strength of the prosecution's case. *Hernandez*, 923 F.3d at 551 (citation omitted); *see also id.* at 554 ("In sum, the jury heard overwhelming evidence that Hernandez had the specific intent to rape both Bristol and Ryan, and that he murdered both women willfully, deliberately, and with premeditation.").

deliberation and premeditation, so that it must have been formed upon preexisting reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation." It also found that Rogers "weigh[ed] and consider[ed] the question of killing and the reasons for and against such a choice and, having in mind the consequences, he decide[d] to and [did] kill." And the jury found beyond a reasonable doubt that Rogers acted with the "unjustifiable or unlawful motive or purpose to injure another, which proceeds from a heart fatally bent on mischief or with reckless disregard of consequences and social duty."[15]

As addressed below, the five errors identified by the majority do not together constitute "cumulative prejudice." *Wood*, 64 F.3d at 1439. The factual sequence of the murders and the prosecution's evidence and closing arguments together reveal the strength of the case for legal sanity. Although anything is theoretically "possible," *Richter*, 562 U.S. at 111, it is not reasonably likely that Rogers would have obtained a different verdict with competent (or even perfect) counsel. After all, "even the most competent of counsel could not have altered the facts." *Hurel Guerrero v. United States*, 186 F.3d 275, 282 (2d Cir. 1999) (citation omitted).

## A. Opening Statement

The majority begins its prejudice analysis with defense counsel's opening statement. And it makes much of defense counsel's failure to define legal insanity and list the elements

---

[15] For attempted murder, the jury necessarily found, beyond a reasonable doubt, that Rogers "[t]ried and failed to murder Ray Horn," "[w]ith premeditation" and "malice aforethought." And for grand larceny, the jury found that Rogers "willfully" and "[w]ith the specific intent to permanently deprive the owner," stole a motor vehicle.

of the NGRI defense at that time.  But the majority neglects to mention what defense counsel did say.  Defense counsel's opening highlighted Rogers's bizarre statements and behavior and told the jury that the evidence would show that Rogers "was not behaving like a person who knew that he had murdered three people and was running away from that type of a crime"—the essence of the insanity defense. Defense counsel also told the jury: "The most important things that will come out of the District Attorney's proof to you is not whether Mark is a person who did these things but the most important thing for you to remember is Mark's mental state at the time this happened through lay witnesses and through the psychiatrists who later examined Mark."[16]

---

[16] I don't see how defense counsel discussing the legal requirements for insanity, along with highlighting some of the evidence (as counsel did), would have even benefited Rogers.  The discussion of legal requirements might have been off-putting in the opening or might have predisposed the jury *against* Rogers as to the insanity defense before the jury even heard the trial testimony.  "By telling a simple story in an opening, the lawyer will establish a theme, capture the jurors' interest, and help the jurors focus on the important parts of the testimony that is coming." Hon. Richard B. Klein, Trial Communication Skills § 21:3 (2d ed., Nov. 2021 Update).  Putting the legal elements of proving insanity in such a story is unlikely to be something that would hold the jury's attention or even be remembered.  And it is not intuitive that it would help the defense.  Defense counsel told the jury: "The officers from Canada will tell you that Mark pulled out a pen . . . and said, 'This proves I'm the king of North America.'"  The jury would remember that.  The same can't be said of something like: "Now the judge will instruct you at the conclusion of the case that you must find Mark not guilty by reason of insanity if the defense proves to you by a preponderance of the evidence—preponderance means more likely than not—that Mark was legally insane.  Now Mark is presumed legally sane, and the judge will tell you what that means.  Legal insanity is a diseased or deranged condition of the mind which makes a person incapable of knowing or

The majority maintains that defense counsel's failure to explain the NGRI defense meant that "the jury was given context for how the evidence that would be presented related to the murder charge, but it was given inadequate context for how the evidence would relate to the insanity defense." Majority Op. at 32–33. "As a result," under the majority's assessment, "the jury had little context for understanding the significance of the State's evidence of Rogers's bizarre behavior before and after the crime, or the defense evidence of mental illness." *Id.* at 36. But with proper context, featuring the elements of the NGRI defense in the opening statement, the majority posits that the jury "would have been primed to consider the testimony of the mental health experts in the context of the defense's NGRI theory." *Id.* at 40.

Nowhere, however, does the majority explain the standalone effect of a jury unprimed with the elements of the NGRI defense at the outset.[17] Understandably so, because the jury was primed right before it deliberated. The trial judge instructed the jury on Rogers's NGRI plea. He explained that, although the prosecution bore the burden of proving the elements of the crime beyond a reasonable doubt, the defense bore the burden of proving legal insanity by a preponderance of the evidence. And after stressing that

---

understanding the nature and quality of his act or makes a person incapable of knowing or understanding that his act was wrong."

While the majority takes me to task for this "range of contentions" it claims are just my "assertions," Majority Op. at 50 n.15, it ironically "asserts" that defense counsel's "omitting the proper [NGRI] context . . . made the NGRI defense less likely to succeed," Majority Op. at 33.

[17] Still, the jury knew from the prosecution's opening statement that Rogers had the burden of showing legal insanity by a preponderance of the evidence.

the inquiry centered on Rogers's mental condition at the time of the offenses, the judge described the two alternative ways the jury could find Rogers legally insane under Nevada law. The jury thus knew that the burden to prove legal insanity fell on Rogers, that there were two pathways to finding insanity, and that Rogers had to have been legally insane when he killed the Strodes to succeed in his insanity defense.

Defense counsel's supposedly underdeveloped opening statement did not disrupt this context for the jury's deliberations. In this regard, neither Rogers nor the majority cite any case supporting a finding of prejudice based on defense counsel's failure to recite the standard for a defense in an opening statement. *Cf. United States v. Rodriguez-Ramirez*, 777 F.2d 454, 458 (9th Cir. 1985) ("The timing of an opening statement, and even the decision whether to make one at all, is ordinarily a mere matter of trial tactics and in such cases will not constitute the incompetence basis for a claim of ineffective assistance of counsel."). Defense counsel's failure to recite the standard here does not support such a finding.

## B.  Drs. Rich & Richnak

In footnotes, the majority discusses defense counsel's failure to adequately prepare Drs. Rich and Richnak for their testimony. Majority Op. at 36 n.10, 43 n.12. The majority makes three distinct findings related to these two psychiatrists: (1) they were unprepared to opine on the ultimate issue of Rogers's sanity at the time of the murders *because* they were not given the same materials that Dr. Pauly received; (2) they undermined Dr. Pauly by saying they *could not* reach the ultimate issue; and (3) they were not given historical records to aid their evaluation of Rogers's schizophrenia diagnosis, weakening their credibility. I disagree with each prejudice finding.

First, the majority holds that "[i]f Drs. Rich and Richnak had been adequately prepared, they would have had the same materials as Dr. Pauly and would have therefore had the tools to form an opinion on the ultimate issue." *Id.* at 36 n.10. But the majority has no basis to determine that even with these "tools," Drs. Rich or Richnak would have concluded that Rogers was legally insane when he committed the crimes. Each expert would have conducted an independent review of Rogers's medical history and compared that with their own evaluations to make that determination. Having the same record as Dr. Pauly would not change the fact that *Rogers refused to discuss the events with Drs. Rich and Richnak*—the primary reason both experts gave for being unable to opine on his sanity on the day of the murders. The majority's assumption that they would reach the same conclusion as Dr. Pauly if provided more materials is completely ungrounded, and more to the point, completely at odds with their *actual* testimony.[18] Counsel, no matter how competent, can only play the cards they're dealt. Here, their client claimed he could not remember anything that happened on the day of the murders (or said he was unwilling to discuss what happened on that day), and Drs. Rich and Richnak said that precluded them from opining on the ultimate issue. Aside from the very likely damage to his case that Rogers caused by the claim of amnesia as to the murders, it was Rogers's assertions and not

---

[18] Counsel testified at the habeas hearing that Drs. Rich and Richnak were not called to testify on Rogers's insanity, and that because Rogers would not talk to them about the crimes, they felt they couldn't testify to his mental state at the time of the crimes. Of course, neither further preparation of nor further access to materials by Drs. Rich and Richnak could have changed Rogers's decision not to talk to them about the crimes.

defense counsels' action that precluded Drs. Rich and Richnak from opining on the ultimate issue.

But let's counterfactually assume the majority is correct as to what Drs. Rich and Richnak would have testified to had they been prepared with the "same materials as Dr. Pauly." And let's also assume the trial court would have allowed three (or four, counting Dr. Molde) expert witnesses to testify to the same thing. In such a hypothetical case, their testimony would have been cumulative to Dr. Pauly's extensive testimony on the same point. The failure to present this cumulative testimony is not prejudicial ineffective assistance. *See United States v. Schaflander*, 743 F.2d 714, 718 (9th Cir. 1984). Finally, their opinion on the ultimate issue would have been even less persuasive than Dr. Pauly's. Dr. Richnak admitted that he felt "deceived" by Rogers, who had an "amazing recovery of recent and remote memory . . . immediately after his competency hearing in [the] courtroom." And while Dr. Pauly examined Rogers twice, for three and a half hours total, Dr. Rich performed only one examination, which lasted "[a]pproximately an hour and a half." Thus, even if defense counsel had provided Drs. Rich and Richnak with the appropriate "tools" to opine on Rogers's mental state at the time of murders, and even if they then would have been able to opine on the ultimate issue (contrary to their trial testimony), their testimony would not have been reasonably likely to change the jury's verdict.

Second, the majority states that "Drs. Rich and Richnak could have been prepared to testify in a way that did not contradict Dr. Pauly's conclusion that he had enough information to opine on insanity." Majority Op. at 36 n.10. The majority asserts that the defense counsel "left [the jury] to wonder why only one of the testifying mental health experts—and, conveniently, the hired defense expert—had

enough data to draw a conclusion on Rogers's sanity." *Id.* This contention is refuted by the record.  At the outset, the majority's first point shows that this second point is illogical. Because Drs. Rich and Richnak were not provided with the same materials Dr. Pauly used to prepare for his testimony, a reasonable jury could differentiate each witness's ability to form an opinion based on the information they accessed. The witnesses also explained to the jury precisely why they could not reach the ultimate issue.  Dr. Richnak testified on cross-examination why he could not opine on it:

> Q:  Did you ever try to make a determination on whether he knew right from wrong on December 2nd, 1980, when these alleged crimes were supposed to have taken place?
>
> A:  I'm not able to do that.
>
> Q:  Why not?
>
> A:  He's been unwilling to discuss the events of December 2nd with me, where he was, physically and geographically.  He has refused to discuss that part of his life with me.
>
> . . . .
>
> A:  I find it difficult to comment on his criminal responsibility.

Dr. Rich likewise testified (again on cross-examination) that he did not evaluate Rogers "with regards to his mental state at the time of the alleged offenses," because Rogers told Dr. Rich "that he didn't remember the crimes he was

charged with."**[19]**   The limitations on these two witnesses should not have affected the jury's consideration of Dr. Pauly's conclusion.**[20]**   And again, better preparation could not have changed the facts.

Moreover, Dr. Pauly fully explained (on cross-examination), why *he* could opine on Rogers's sanity. Dr. Pauly was asked about the propriety of giving the diagnosis and testimony he did (that Rogers was schizophrenic and legally insane at the time of the killings), having only first seen him a year after the murders:

> I think it's very responsible practice to weigh all of the evidence available and then render the opinion that I made because it was very clear that since I did not have the opportunity

---

**[19]** In my view, there were two possible explanations for why Rogers wouldn't discuss the events of December 2nd.   First, that Rogers genuinely didn't remember what happened (though no one testified, either at trial or as part of the habeas case, that such *highly focused* temporary amnesia was a symptom of schizophrenia).   Or second, that he did remember but didn't want to discuss what happened with the doctors (including because such a discussion might further show that he was *not* legally insane).   No matter how competent Rogers's counsel were, they wouldn't have been able to persuade a jury that explanation one was more likely than explanation two, or even that explanation one was at all likely.   Significantly, Rogers remembered what happened enough to tell officers when he was arrested in Florida that he did it in self-defense.

**[20]** Dr. Richnak testified that "looking at . . . how [the act] occurred . . . [would] not necessarily" indicate whether the defendant was legally sane at the time of the act, unless "it was particularly bizarre."   Yet he also testified that although "[i]t's a very difficult type of decision," it *is* possible to "judge whether somebody did [a criminal] act knowing the difference between right and wrong."   Dr. Richnak's general opinions, on balance, did not undermine Dr. Pauly's testimony.

to examine Mark Rogers at the time of the alleged crime, the next best thing that could be done is to examine the evidence that is available from those people who saw him on the day of that crime.

I think that is a very appropriate thing to do and that it has been the basis of my conclusion to compare the descriptions of his behavior at the time in question with my examination of him ten months later.

I think that is . . . the only way that this particular case could be approached.[21]

Finally, the majority contends that "the opinions of [Drs. Rich and Richnak] lacked credibility because trial counsel did not provide them with relevant historical records necessary to support their diagnosis, which the prosecutor highlighted during cross-examination." Majority Op. at 41

---

[21] There are several schools of thought on the propriety of this type of expert testimony. For example, Dr. Gutride, like Drs. Rich and Richnak, had no opinion on whether Rogers could tell right from wrong at the time of the killings. "[I]t would have been a tremendous leap for me to draw a conclusion and say what he was like back then a year and some months later going on what had happened." But Dr. Gutride also testified it *was* appropriate to "walk into a courtroom ten months after an incident and be able to testify on whether or not the defendant knew right from wrong at the time of that incident." "It's an accepted practice. We are called upon to do that all the time." I also note that since 1984, Congress has deemed the practice impermissible in federal criminal cases. "In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Fed. R. Evid. 704(b).

n.11. But the record demonstrates that Drs. Rich and Richnak were shown to the jury to be reliable expert witnesses, and they presented credible diagnoses of Rogers's schizophrenia. Dr. Richnak, who specialized in forensic psychiatry and who was the medical director at Lake's Crossing, spent "twenty or thirty hours" observing Rogers over a five-month period, conducted a "mental status examination," and "gathered [history] from various sources," all of which led him to diagnose Rogers as "suffering from schizophrenia, paranoid type." "Individuals with schizophrenia . . . have difficulties with thinking, and they [have] confused thoughts . . . [, and] often tell you, '[m]y thoughts are jumbled up or confused,' or, '[m]y thoughts stopped." Dr. Richnak also did not agree with Dr. Gutride's diagnosis, which was "at variance to [Dr. Richnak's] diagnosis." Dr. Richnak offered examples of Rogers's behavior in support of his diagnosis.[22] Indeed, Dr. Richnak ended his testimony answering a question *from the court*: "My final impression after reviewing all of the material and having examined him on several occasions is that he is suffering from schizophrenia, paranoid type."

Dr. Rich, also a psychiatrist, diagnosed Rogers with paranoid schizophrenia in remission—which he explained to mean someone usually "has periods . . . when their symptoms are much worse and then they have periods when they aren't as bad." Dr. Rich described one incident where Rogers jumped onto a car while trying to hitchhike, then worried "that the two men driving the car were trying to kill him." Dr. Rich testified that "[p]aranoid schizophrenia is a

---

[22] For example, Rogers was observed "standing very rigidly or posturing" and "seemed to be in a trance," staring directly into the sun. During one interview, Rogers "showed some preoccupation on the possibility of a nuclear attack."

severe mental illness"—"a psychosis" that can cause the person to "not know what is real and what is not real," or to "have fears and delusions," such as "fears that someone is trying to harm them in some way." It can also cause a person to "hear things that don't exist or see things that are not there." Although Dr. Rich did not opine on the ultimate issue, he did testify during cross-examination that there is "necessarily" a connection between the diagnosis of schizophrenia "and a person not being able to know right from wrong."

Contrary to the finding of the district court, the testimony of Drs. Rich and Richnak was the opposite of "mostly pointless." First, the diagnosis of schizophrenia was necessary (but, of course, not sufficient) to prove legal insanity. As the court instructed the jury: "Legal insanity . . . means a diseased or deranged condition of the mind which makes a person incapable of knowing or understanding the nature and quality of his act or makes a person incapable of knowing or understanding that his act was wrong." Here, that "diseased or deranged condition of the mind" could have only been schizophrenia.

The observations by both doctors showed the jury that they had ample evidence on which to base their schizophrenia diagnoses. The cross-examination's focus on their limited review of Rogers's medical history could not erase the examples they recounted from the minds of the jury. Their testimony made the jury aware of the connection between schizophrenia and legal insanity. Even if Drs. Rich and Richnak could not offer an opinion on the ultimate question of legal insanity because Rogers refused to discuss the day of the crime with them, the jury could have taken their testimony as strong evidence of Rogers's schizophrenia to bolster a finding that Rogers was legally insane. But the

jury rejected Rogers's NGRI defense. No further preparation for these witnesses' discussion of Rogers's schizophrenia would have been reasonably likely to lead the jury to reach the opposite conclusion.

For these reasons, any further preparation of Drs. Rich and Richnak would not have been reasonably likely to alter the jury's rejection of Rogers's NGRI defense. The preparation of Drs. Rich and Richnak thus did not prejudice Rogers in any of the ways discussed by the majority opinion.

## C. Dr. Pauly

The majority also finds that Rogers's NGRI defense was prejudiced by defense counsel's failure to adequately prepare Dr. Pauly.[23] Dr. Pauly was the sole defense witness "who was willing and able to testify to whether Rogers was legally insane at the time of the offense." Majority Op. at 36. The majority believes that the inadequate preparation of Dr. Pauly exposed his testimony "to attack on several fronts," including that "he only met with Rogers twice (for under four hours total)," that "he was hired by defense counsel for his opinion," and that "he failed to review daily progress notes [from Lake's Crossing] in rendering his opinion." *Id.* at 36–37. But these shortcomings or supposed shortcomings did not disadvantage Rogers in the way the majority suggests.

---

[23] I agree that defense counsel could have better prepared Dr. Pauly, but I do not believe their preparation was deficient under *Strickland*. As the majority opinion notes, defense counsel "did not meet with Dr. Pauly in person, discuss with him the other expert reports that contradicted his conclusion that Rogers was schizophrenic, or give him daily progress notes from Lake's Crossing that detailed Rogers's behavior while he was being evaluated." Majority Op. at 10.

The majority finds Dr. Pauly's testimony vulnerable because he had only two meetings with Rogers and because he acknowledged failing to review the Lake's Crossing daily progress notes. According to the majority, "[i]f Dr. Pauly had been prepared with the progress notes, he would not have had to admit on cross-examination that he did not review the notes, which he conceded could have been 'of some value,' and his credibility would not have been so undermined." *Id.* at 44. But the supposed concession to which the majority refers was a noncommittal statement that the notes *could have* been of some value, in supplement to the other providers' reports that he reviewed:

> Q: You have indicated you looked at all the reports from the other psychiatrists and psychologists and other medical people that have examined him, that is, the defendant, since the time of his arrest, is that correct?
>
> A: I don't know if it was everyone but everyone in this folder, that is, seven psychiatrists and three or four psychologists.
>
> . . .
>
> A: I didn't rely on any one report. I read this document that is about an inch thick and relied on everything in it together with my own examination of the client.
>
> Q: Did you review those documents, the records of the defendant while he was in Lake[']s Crossing for six months, the

daily reports that show his behavior and actions?

. . .

A: No.  I only reviewed the bottom line, the final reports that are in this folder.

Q: All right.  Do you think that would have been of any value to find out on a daily basis for six months how the defendant behaved while he was under observation at Lake[']s Crossing?

A: I think it could have been of some value, yes.

Read in context, Dr. Pauly's supposed concession—which the majority believes so undermined his testimony—hardly moves the needle.  Even less so when considered alongside Dr. Pauly's adjacent testimony that he reviewed the "final reports" of the "seven psychiatrists and three or four psychologists," totaling "about an inch thick" and including "the bottom line" of the evaluations.  Granted, Dr. Gutride—one of ten or eleven practitioners—opined that his reports "only very sketchily summarized" his daily notes. But it is unclear whether any of the others felt similarly.  And as he noted to the jury, Dr. Pauly also reviewed the prosecutor's investigative reports of witnesses who saw Rogers on the day of the killings and on three days soon after.  This all supplemented Dr. Pauly's own two-part, three-and-a-half-hour evaluation of Rogers. Of note, the prosecutor never mentioned this supposed shortcoming in his closing.

That Dr. Pauly acknowledged being hired by defense counsel is a non-sequitur.[24] Nevada pays for expert services for indigent defendants "as may be necessary for an adequate defense," *see* Nev. Rev. Stat. § 7.135 (1981), as do most, if not all states. And in its closing statement, the defense effectively rebutted this argument. Counsel noted that the State of Nevada, not the public defender's office, paid Dr. Pauly—just as it paid the State's investigator on the case. And Dr. Gutride, whom the prosecution called as a witness, was paid his entire salary by the State.

The majority also focuses on defense counsel's failure to adequately prepare Dr. Pauly by insufficiently investigating Rogers's background. It notes Rogers's mother's testimony about Rogers's "violent and impulsive behavior growing up," stressing that Dr. Pauly was unable "to place those behaviors in the proper context" by explaining them "as emblematic of the prodromal stage of schizophrenia and not ASPD [antisocial personality disorder]." Majority Op. at 38, 43. The majority also bases its finding of prejudice on "evidence of Rogers's mother drinking while pregnant and Rogers's childhood abuse," which "Dr. Pauly would have testified [are both] contributing factors to the development of schizophrenia." *Id.* at 38.

But the majority's concern that Dr. Pauly's inability to testify on these issues meaningfully reduced the overall effectiveness of his testimony at trial is unsupported by the record. Having a mother who drank while pregnant and

---

[24] The court instructed the jury: "A witness who has special knowledge, skill, experience, training or education in a particular science, profession or occupation is an expert witness. An expert witness may give his opinion as to any matter in which he is skilled." It would be odd for such a skilled person, retained by one side, to testify for free.

suffering as a victim of childhood abuse are contributing factors to the later development of schizophrenia, as Dr. Pauly has since acknowledged.  But Dr. Pauly never suggested that such contributing factors made it *likely* that Rogers would develop schizophrenia.  And indeed, he could not have.  The then-current version of the Diagnostic and Statistical Manual of Mental Disorders (DSM-III) did not list fetal alcohol exposure among the "[p]redisposing factors" for schizophrenic disorders.  *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 186 (3d ed. 1980).  And forensic psychiatrist Dr. Melissa Piasecki, testified in the habeas proceeding that in 1981, the medical community understood only that an unclear but significant amount of fetal alcohol exposure led to children born with facial, growth, and cognitive abnormalities. Dr. Piasecki also noted that none of the contemporaneous experts diagnosed Rogers with fetal alcohol syndrome or related syndromes, despite documentation that he was exposed to alcohol in utero.

Probing into Rogers's past at trial might have opened the door to damaging testimony about Rogers's violent and impulsive behavior when he was younger.[25]   Thus, the

---

[25] As a child, Rogers was reportedly expelled from Catholic elementary school for hitting a nun, and suspended in high school for hitting a teacher.  He killed a dog that he usually played with after the dog bit him, and he beat up and choked friends and acquaintances on various occasions, including breaking a wooden chair over one's head. His juvenile criminal record included five petty theft offenses, a BB gun firearms offense, operating a car without a driver's license, and many other motor vehicle offenses.

Rogers joined the Marine Corps but was discharged a few months later for fraudulently enlisting by lying about his criminal record.  Soon after, he pleaded guilty to two felony fourth-degree aggravated assault

evidentiary value of Rogers's childhood and exposure to alcohol in utero in relation to his legal sanity during the murders is limited, and Dr. Pauly's inability to testify to that effect did not prejudice Rogers's NGRI defense.

Most importantly, but ignored by the majority, Dr. Pauly's testimony was first-rate. As discussed below, Dr. Molde characterized Dr. Pauly's testimony as a "masterful job," adding that he would have had nothing of substance to add to it had he been called to testify. Dr. Pauly testified that several doctors who examined Rogers described him as schizophrenic, and that this was the most consistent diagnosis. And he noted that the descriptions of Rogers's behavior at the time of the killings matched his own observations ten months later of "classic symptoms of psychotic thought disorder which is the hallmark of the diagnosis of schizophrenia." Dr. Pauly's core conclusion was that Rogers was legally insane at the time of the killings:

> A: My opinion is that Mark Rogers was so virtually psychotic at the time of the crime, that he was suffering from paranoid delusions, that he had been under considerable stress . . . and given his emotional status, that he was actively psychotic and under that influence of being paranoid, that he was incompetent and unable to distinguish between right and wrong.
>
> . . .

---

charges. He failed to show up to a hearing in the second case and forfeited his bond.

[Rogers] was psychotic and he was in a very frightened and paranoid state which is clearly documented by witnesses who saw him immediately before and others who described his behavior immediately after the murders and that this is consistent with my reevaluation of him several months later and that this is the description of a psychotic paranoid schizophrenic and on the basis of that diagnosis I'm saying that he was delusional and, therefore, unable to distinguish between right and wrong at that time.

Q: And was he able to distinguish the nature and quality of his acts?

A: I do not believe that he was.

Cross-examination hurt the prosecution as much as it helped. And when it helped the prosecution, it had nothing to do with inadequate preparation—it had to do with facts that were inadequate to prove legal insanity. For example, the prosecution (for reasons unknown) asked Dr. Pauly to testify that two uncalled psychiatrists—Drs. Lincoln and Chapel—also believed that Rogers did not know right from wrong. Although Dr. Pauly acknowledged that Rogers had suffered from an antisocial personality, he noted his agreement with such assessment for an earlier period while also observing that it was "not consistent with [his] understanding of [Rogers's] behavior in the time frame that we are referring to here." Turning a negative (antisocial personality) into at worst a neutral (consistent with the expert's view of the facts) is the hallmark of an effective expert.

Dr. Pauly admitted, as he had to, that even schizophrenics vary in their ability to be coherent. But before the prosecutor could ask another question, Dr. Pauly added: "The fact that [Rogers] was able to talk coherently one moment does not negate the fact that in the ride with the person who picked him up that he spoke in a manner that was described as rambling." Again, the hallmark of an effective expert.

Dr. Pauly also exploited some of the prosecutor's ineffective questions. At one point, the prosecutor asked Dr. Pauly if it was true that there could be interpretations other than his own. With that, Dr. Pauly pounced: "Oh, I dare say that you would be able to get other interpretations . . . but, my point is there is a good deal of consistency in the diagnosis of seven psychiatrists who saw . . . Mr. Rogers." In another example, the prosecutor tried to make something of Dr. Gutride's different diagnosis. And Dr. Pauly admitted, as he had to, that Dr. Gutride's opinion was contrary. But he went on at length with no objection from the prosecutor:

> A: That was the one divergent opinion. Dr. Martin Gutride's report was the only one who did not speak with the diagnosis of a psychosis although he came close in using a schizo type of personality.
>
> He even acknowledged that this man has an unusual personality that he diagnosed as schizo type but which he diagnosed as a personality disorder.
>
> So, his was the one diagnosis, in my opinion, that was notconsistent.

Q: So, you disregarded his opinion from that?

A: No, I didn't disregard it. I noted it as being a contradiction with the other ten.

Q: I see.

The quality of Dr. Pauly as an expert witness speaks for itself.

These examples (among others throughout the record) show that the majority views Dr. Pauly's testimony in a way entirely divorced from the record. The prosecutor scored points only because the evidence of Rogers's sanity was overwhelming. Dr. Pauly did his best with the facts, as they were, and the deficiencies in his preparation had no material impact on his effective testimony.

## D. Dr. Molde

I agree with the majority that counsel should have called Dr. Molde, and I find that this error likely meets the *Strickland* deficiency prong. Majority Op. at 19. I note, though, that Dr. Molde did not go unmentioned. Dr. Pauly testified that psychiatrist Dr. Molde had—like Drs. Pauly, Rich, and Richnak—found that Rogers was a "paranoid schizophrenic."

I disagree, however, with the majority's conclusion that failing to call Dr. Molde was prejudicial. The majority's view is based on three central findings. First, Dr. Molde's testimony would "have *confirmed* Dr. Pauly's testimony that Rogers 'did not know right from wrong or know the nature and quality of his act.'" Majority Op. at 40(emphasis added). Second, Dr. Molde would have been immune from

the "hired gun" attacks that Dr. Pauly received, as well as the credibility attacks based on the time spent with Rogers. *Id.* at 40–41, 43 n.12. Third, Dr. Molde's testimony would have "severely undercut" the prosecution's witnesses. *Id.* at 41. We have held that prejudice is not established where unintroduced testimony was cumulative to the testimony presented. *See Schaflander*, 743 F.2d at 718; *cf. Clabourne v. Lewis*, 64 F.3d 1373, 1382 (9th Cir. 1995) (finding no *Strickland* prejudice where four additional witnesses were not interviewed to corroborate defendant's taped confession). This is an archetypal cumulative testimony case.

First, as the prosecution argues, Dr. Molde's testimony "confirm[ing]" Dr. Pauly's opinion of Rogers's sanity would have been cumulative. Majority Op. at 40. The majority believes that "Dr. Molde would have explained how the bystanders' descriptions of Rogers's behavior and his numerous examinations allowed him to reach the conclusion that Rogers was insane at the time of the offense." *Id.* at 40. Testimony was introduced referring to odd and bizarre statements made by Rogers. For example, according to a witness who drove him towards the Strode residence, he stated, "Somebody is shooting rockets . . . and one of these days it will hit my pyramid and blow me up." *Rogers*, 705 P.2d at 667 (alteration in original). Similarly, when he was trying to cross the border into Canada, he told the agents that "he considered himself . . . [the] Emperor of North America," that he "felt that [the Canadians] were the good guys," and that the CIA, FBI, and the mafia were after him. It is unclear why *another* expert needed to situate these particular facts for the jury when Dr. Pauly discussed his evaluation of these statements and other similar behavior.

Dr. Pauly examined Rogers twice to determine his mental state at the time of the alleged crimes and concluded that Rogers was suffering from paranoid schizophrenia. He testified at trial that he had reviewed the reports of the other psychiatrists and psychologists who examined Rogers. He recounted specific behaviors he observed and explained to the jury how they were "associated with a certain kind of psychiatric disorder." In response to hypotheticals posed by the defense counsel stipulating the bystanders' observations of Rogers on the days before the crime, Dr. Pauly testified that he found evidence of "paranoia and grandiose delusions" and "a lack of affect, all symptoms characteristic of schizophrenia," and that he also believed the "individual was clearly psychotic." After answering hypotheticals, Dr. Pauly gave unequivocal testimony that Rogers "was so virtually psychotic at the time of the crime . . . that he was incompetent and unable to distinguish between right and wrong" or "distinguish the nature and quality of his acts." During the evidentiary hearing for Rogers's habeas petition, Dr. Molde acknowledged that had he been called to testify, he "*would have just gotten up and said, hey, I like what Dr. Pauly just said, let's go with that. . . . I don't know that I would have covered anything that he didn't.*" Dr. Molde said that he thought Dr. Pauly did a "masterful job" at trial describing the insanity defense. Dr. Molde's testimony, as the majority realizes, would have been cumulative to Dr. Pauly's. Majority Op. at 40 (finding Dr. Molde would "have confirmed Dr. Pauly's testimony"). For that reason, the lack of Dr. Molde's testimony is not prejudicial. *Schaflander*, 743 F.2d at 718.[26]

---

[26] The majority casts Dr. Molde's potential testimony as not cumulative by stating that "[i]f Rogers had even one additional medical expert testify about the central point of his defense—whether he was

Second, the majority contends that Dr. Molde's status as a court-appointed medical expert,[27] as well as how long he spent evaluating Rogers,[28] made his credibility more

---

insane at the time of the crime—he would have rebutted the prosecution's attack that the only person willing to testify that he was insane at the time of the crime was a hired gun." Majority Op. at 43 n.12. But this potential rebuttal does not pertain to cumulativeness. *Schaflander* does not help the majority's argument. *See* 743 F.2d at 718. If twenty-eight more witnesses would have been cumulative to the fifteen defense witnesses—almost tripling the number of witnesses for the defense—then doubling the number of witnesses who would testify that Rogers was insane at the time of the offense, from one to two, could also be cumulative. The determination would turn on how similar the testimony would be. *See Eslaminia v. White*, 136 F.3d 1234, 1239 (9th Cir. 1998) ("To be truly considered cumulative, there must be an extremely close relationship between the extrinsic evidence and the evidence actually admitted."). Because Dr. Molde himself testified that he did not "know that [he] would have covered anything that [Dr. Pauly] didn't," his testimony would have been duplicative to the testimony the jury heard from Dr. Pauly.

[27] The trial court had also appointed Drs. Rich and Richnak to assess Rogers's competency to stand trial. Defense counsel thus called two witnesses who were not subject to a "hired gun" attack. And the defense emphasized in its closing argument that Dr. Pauly was "paid by the State of Nevada" and argued that he and the prosecution's investigator "are all professionals" who would not "lie merely because [they are] getting paid by one side or the other." This factor does not contribute to prejudice.

[28] Dr. Molde met with Rogers five times, first interviewing him in January 1981, then twice in April 1981, then in June and July 1981. Although this exceeds Dr. Pauly's number of interactions—twice, for three and a half hours total—it pales in comparison to Dr. Richnak's three formal evaluations and "twenty or thirty" interactions total. In any event, Dr. Gutride still met with Rogers far more than any of the other experts, having "spoke[n] with him briefly every day" during his months in Lake's Crossing. Three more interviews would not have made Dr. Molde's evaluation of Rogers's sanity so much more credible than Dr. Pauly's that his not testifying was prejudicial for that reason.

immune to the prosecution's cross-examination than Dr. Pauly's. First, a fair reading of the record shows that Dr. Pauly performed very, very well under cross-examination, indeed, that he did a masterful job. So the bar would have been very high for Dr. Molde. And second, the majority does not even consider how Dr. Molde's cross-examination would have diminished *his* credibility. As the State points out in its briefing on appeal, because Dr. Molde "disagree[d]" with the DSM-III—the leading medical text—about the diagnostic requirements for paranoid schizophrenia, the prosecution had a different potential line of attack for cross-examining Dr. Molde. We have no way of knowing how the jury would have perceived Dr. Molde's testimony had he departed from the DSM-III. Alternatively, the jury might have thought less of the testimony from the other expert witnesses for the defense, which relied on the DSM-III, jeopardizing Rogers's case. Moreover, I don't see how Dr. Molde's credibility would have sufficiently enhanced the NGRI defense such that it would have persuaded the jury that Rogers was legally insane. Dr. Molde, by his own admission, would have given entirely cumulative testimony, repeating Dr. Pauly's "masterful job." *Cf. Clabourne*, 64 F.3d at 1382.

Finally, the majority asserts that Dr. Molde would have more effectively undercut Dr. Gutride's testimony. In this regard, I disagree that defense's cross-examination of Dr. Gutride was constitutionally deficient (especially when considering the other evidence that undercut Dr. Gutride), which I address further in the following section. In any event, anything Dr. Molde might have told the jury would have been cumulative to Dr. Pauly's testimony. The addition of Dr. Molde's testimony would not have been reasonably likely to have affected the outcome of the trial.

### E. Dr. Gutride

The majority holds that "[t]rial counsel performed deficiently by not preparing to rebut the State's mental health expert, Dr. Martin Gutride." Majority Op. at 29. First, the majority found it deficient that trial counsel did not adequately prepare defense experts to rebut Dr. Gutride's testimony. *Id.* at 30. The majority also found it deficient that "trial counsel did not prepare to impeach Dr. Gutride with the fact that it was accepted at the time of Rogers's trial that a diagnosis of schizophrenia preempts, or precludes, a diagnosis of ASPD." *Id.* at 30. In concluding that these deficiencies were prejudicial, the majority points out that trial counsel could

> have pointed out internal inconsistencies in Dr. Gutride's reports, his lack of experience in diagnosing malingering, the daily progress notes that undermined his conclusions, and the evidence the State itself presented regarding Rogers's behavior before the offense that undermined a malingering finding. Trial counsel would have challenged Dr. Gutride's assertion that schizophrenia and ASPD are not necessarily inconsistent with the information in the DSM-III about preemption.

*Id.* at 45. In sum, the majority found it deficient that much of Dr. Gutride's opinion went unchallenged, which was ultimately prejudicial to Rogers. *See id.* at 42–46.

I see things differently. The cross-examination of Dr. Gutride was not constitutionally deficient. *Cf. Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000) ("[C]ounsel's representation must be only objectively reasonable, not

flawless or to the highest degree of skill"); *id.* (holding that counsel's cross-examination of a witness was not ineffective, even if he could have "conducted a more thorough and vigorous examination").

Begin with the presentation of the defense's expert witnesses. <u>All three of the defense's experts discussed Dr. Gutride *before* Dr. Gutride testified.</u> Dr. Richnak rejected Dr. Gutride's finding that Rogers was malingering and noted on cross that other staff in Lake's Crossing also disagreed with Dr. Gutride. He walked through the factors for malingering under DSM-III and explained why they showed Rogers was not malingering. Dr. Richnak testified that Dr. Gutride's impression that Rogers had an antisocial personality disorder was "at variance to [Dr. Richnak's] diagnosis," and that he disagreed with Dr. Gutride's report. Dr. Rich, noting that Dr. Gutride was a psychologist and not a psychiatrist (i.e., not a medical doctor, unlike all the medical doctors who disagreed with Dr. Gutride), disagreed with Dr. Gutride's findings that Rogers had antisocial personality disorder and that Rogers was malingering. Despite these lodged disagreements, which the jury weighed, Rogers argues, and the majority agrees, that Dr. Gutride's daily notes documenting Rogers's stay at Lake's Crossing would have enhanced Rogers's assertion that he suffered from paranoid schizophrenia. Majority Op. at 44–45. In my view, this evidence would have been merely cumulative, particularly because Dr. Pauly gave a "masterful" presentation of the defense's position that Rogers suffered from schizophrenia, to which I turn next.

Dr. Pauly's testimony is even more significant to the majority because he opined on Rogers's insanity at the time of the offense. The majority believes that defense counsel should have discussed Dr. Gutride's reports with Dr. Pauly

in preparation for trial, so that he was better able to "explain the basis not only for his disagreement with Dr. Gutride's diagnosis, but also to explain that Dr. Gutride did not have a sufficient basis for his conclusions." *Id.* at 30. But Dr. Pauly didn't need any further preparation. He had reviewed "the entire record," including Dr. Gutride's report, and, as quoted above, acknowledged that Dr. Gutride was the only "divergent opinion" among *eleven* mental health professionals. The jury heard him testify that Dr. Gutride "was the only one who did not speak with the diagnosis of a psychosis although he came close in using a schizo type of personality. He even acknowledged that [Rogers] has an unusual personality that he diagnosed as a schizo type but which he diagnosed as a personality disorder." Dr. Pauly noted that "[e]ven though [Dr. Gutride] had not rendered a [schizophrenia] diagnosis," Dr. Gutride, like all of the other medical professionals who evaluated Rogers, "described him as having poor affect or bland affect or flat affect or very restricted affect," which "is one of the criteria in the DSM 3" for schizophrenia. Like Drs. Rich and Richnak, Dr. Pauly preemptively rebutted Dr. Gutride's testimony to a sufficient extent.

The jury also weighed key points from Dr. Gutride's direct examination against the other expert testimony and considered them alongside his cross-examination. First, just like Drs. Rich and Richnak, Dr. Gutride had no opinion on whether Rogers could distinguish right from wrong at the time of the crimes, which may have compromised the effectiveness of his testimony for the prosecution. Dr. Gutride observed, tested, and interviewed Rogers during his time at Lake's Crossing. He testified that Rogers's "overall profile [was] similar to those of people who have difficulties in impulse control, who tend to be somewhat angry, who often have a history of what is known as

antisocial behavior in actions and who do not always deal very well with their emotions." He also testified that Rogers seemed to be malingering, or "faking bad," given the lack of "consistency to [Rogers's] behavior." He recounted behavior much like what Dr. Richnak described, *see supra* n.21, testifying that Rogers "would stand in the center of the room and the sun would be streaming in the window and he would go through a sort of ritual kind of thing"; to Dr. Gutride, though, this "didn't have a quality of a real psychotic kind of presentation," and "he always seemed to know what was going on around him." Most notably, "right after [Rogers's] first sanity hearing . . . , when [they] returned to Lake[']s Crossing that afternoon," Rogers told Dr. Gutride that "he was so quiet and behaving strangely" because "he [was] a good actor."[29]

Finally, the cross-examination of Dr. Gutride—calling his findings into question—was solid. Defense counsel established that Dr. Gutride had written in one of his own reports that Rogers exhibited symptoms consistent with paranoid schizophrenia: that he had "a paranoid quality to his ideations but he carefully conceals the source of his distrust." This is an important point when considered against the backdrop of the testimony provided by Dr. Pauly. But it's unclear that identifying that schizophrenia and ASPD were mutually exclusive would have gotten the defense very far. Dr. Gutride could have simply agreed with that premise of the question and confirmed his ASPD diagnosis on the stand more robustly. He also could have doubled down on his damaging testimony that he "felt there might have been

---

[29] Again, all the preparation in the world would not have changed the facts—Rogers was an actor, Rogers admitted to Dr. Gutride that some of his "strange" behavior was acting, and the prosecutor effectively argued that Rogers was acting and not legally insane.

malingering instead of actual schizophrenia."  In this regard, the majority conflates questions with answers.  Asking a question on cross of an expert doesn't mean you get a helpful answer.  We need look no further than the prosecutor's cross of Dr. Pauly, discussed above.  The defense had established that Dr. Gutride's opinion was an outlier, and that Dr. Gutride's actual diagnosis was ambiguous.  Had counsel gone after Dr. Gutride more and ended up allowing him to make his points better and more vigorously (as likely would have happened), the cross-examination would have been "ineffective"—likely not constitutionally ineffective, but practically ineffective, and ineffective in a way that takes place every day, in courtrooms across the country.  Good trial lawyers know that trying to make the perfect the enemy of the good, usually leads to neither perfect nor good.[30]

As to malingering, defense counsel undermined Dr. Gutride's testimony by having him acknowledge that the DSM-III was the leading diagnostic authority and

---

[30] "It is . . . necessary for counsel to be certain, when using authoritative books to confront an expert witness, either that the expert has stated an opinion in conflict with the very latest authoritative thinking of his profession, or that he has stated a position on one side of a recognized conflict in thinking in the profession.  Lacking either of these premises, an attack of this nature can have grossly harmful results for a cross-examiner."  William D. Farber, *Contradiction of Expert Witness Through Use of Authoritative Treatise*, 31 Am. Jur. Proof of Facts 2d 443 § 12 (Nov. 2021 Update).  Moreover, if a witness's testimony "on cross-examination has developed a conflict with his testimony on direct examination or with statements in an authoritative treatise, it is generally unwise to ask the witness to state the inescapable conclusion, for almost invariably he will use it as an excuse for making an explanation."  *Id.* § 19.  Even if counsel here had (unwisely) pressed Dr. Gutride on the conflict between his statements about ASPD and the DSM-III, Dr. Gutride could have provided a convincing explanation for the jury.

establishing that Dr. Gutride could not distinguish between "factitious disorder," a DSM-III diagnosis, and malingering. This implied to the jury that he may not have been familiar or knowledgeable enough on the relevant psychiatric disorders. Counsel also elicited testimony that Rogers's behavior in consistently denying medical illness to his psychiatrists and claiming to be ready for trial, contradicted malingering. Dr. Gutride's responses to this line of questioning were particularly poor; counsel even managed to get him to concede that Rogers's inconsistent behavior could signal a schizophrenic disorder. When counsel pressed on this in a hypothetical, the court stated, "This witness hasn't given an opinion on his state of mind at the time of the crimes . . . . He has testified that there was some paranoid characteristics, apparently." On cross-examination, Dr. Gutride stated explicitly: "My diagnosis was not malingering but was an antisocial personality and he was suffering this psychotic behavior." Dr. Gutride thus could not commit to a malingering diagnosis, presenting internally inconsistent positions to the jury.

Despite this rigorous cross-examination and the strength of Dr. Pauly's "masterful" testimony, the jury was not convinced that Rogers was insane at the time of the crimes (apparently not close to convinced, given the short time they deliberated in a capital case). While the majority argues that it would have been better for counsel to have elicited testimony from one of Rogers's experts identifying the inconsistencies in Dr. Gutride's reports, in my view, (1) counsel appropriately identified those inconsistencies on cross-examination, and (2) Drs. Pauly, Rich, and Richnak had testified that Dr. Gutride's opinion differed from theirs and articulated why they thought they were correct and Dr. Gutride was incorrect. Thus, counsel's cross-examination of Dr. Gutride was not constitutionally

deficient—or deficient at all—and did not prejudice the defense's case.

## F. *Prosecution's Case*

The prosecution's arguments to preserve the presumption of legal sanity would have withstood an NGRI defense armed with the majority's suggested improvements. A jury verdict of NGRI would not have been reasonably likely even with better defense counsel. And although the case featured various experts testifying about Rogers's mental health, the prosecution hardly acknowledged the expert testimony as it offered its compelling narrative during closing arguments. The prosecution focused on the sequence of events before, during, and after the murders, explaining why they demonstrated Rogers's legal sanity. That is, the prosecution explained why Rogers's actions evinced his ability to distinguish right from wrong and his knowledge of the nature and quality of his actions— regardless of any official diagnoses or odd behaviors.

This is the key point as to prejudice. The experts acknowledged, as of course they had to, that a person with schizophrenia is not categorically unable to tell right from wrong or unable to understand the nature and quality of his acts.[31] The key missing *evidence*, as opposed to anything missing from the defense presentation, were facts from

---

[31] For example, on cross-examination, Dr. Pauly agreed with the prosecutor that "approximately one percent of the population is diagnosed as having schizophrenia." When asked whether it could be assumed that someone diagnosed with schizophrenia does not know right from wrong, Dr. Pauly replied, "No. Those two do not follow. In other words, not every schizophrenic doesn't know the difference between right and wrong at any given point in time."

which a jury could conclude that Rogers didn't know that he was killing the Strodes or that killing them was wrong.**32**

In a case in which the killer has schizophrenia, there could be facts that show him to be legally insane. For example, a schizophrenic person could hear voices that command specific actions. Such a commanded individual might not know that following the commands is wrong. But here, no evidence suggested that Rogers ever heard commanding voices at any point in his life. Similarly, a schizophrenic individual might hallucinate in such a way as to be unaware that he is killing other humans. But again, no evidence suggested that Rogers had ever suffered from hallucinations, much less hallucinations of that strength.**33** Such a hallucination is unlikely to arise for the first time during the killings. And, of course, there can be evidence that the way a crime is committed shows that the killer didn't

---

[32] The majority neglects to address the absence of any *facts* regarding the murders and how they were committed that support that Rogers was insane when he killed the Strodes. Instead, in response to my points about the absence of such facts, the majority states that "Drs. Pauly and Molde directly opined that Rogers was insane at the time of the crime." Majority Op. at 36 n.9. This highlights my point—there were no such *facts*.

[33] On cross-examination, Dr. Pauly acknowledged that his "was the only report in which auditory hallucinations were indicated by the defendant," and only during his second examination—near the start of trial. Dr. Pauly found Rogers "to be a lot more open in contrast to the first examination that was perhaps seven weeks earlier." But Dr. Pauly testified that "[n]one of the others had described auditory hallucinations." Dr. Richnak offered waffling testimony, however, stating that he witnessed "some indication that [Rogers] was possibly having auditory hallucinations" because one time "he turned his head suddenly as if responding to a voice." But "that was the only indication," and "in direct questioning [Rogers] denied having auditory hallucinations or delusions."

know he was killing or perhaps didn't know it was wrong. But the record here contains no such evidence. Nothing in Rogers's habeas case or the majority opinion explains how, based on the facts, a better defense presentation would have moved the needle on *these* crucial determinants of prejudice.

The prosecution offered an overwhelming factual case for legal sanity. Because insanity is an affirmative defense, Rogers was presumptively sane from the start. And the prosecution portrayed Rogers, an aspiring performer attending two different acting schools in Hollywood, as a man with a terrible temper.[34] His roommate testified that "once in a while" Rogers "got terribly frustrated in his career or mad at" him "and picked up an ashtray or dish" and threw "it like any human being would when you're trying to do your best to make a career and it just doesn't happen overnight." To that end, Rogers had broken a shower door and television set in their house. Rogers's roommate also testified that Rogers's behaviors and series of phone calls before the murders from San Bernardino and Wells, and after the murders from Montreal and Florida, were not unusual.

The prosecution traced Rogers's journey to the site of the murders. And it offered the theory that Rogers entered the Strodes' home—which was adorned with indications that they had and used guns—while they were gone and prepared coffee and beans. Rogers's fingerprints and a Seven-Up can he had obtained while hitchhiking were found in the home. At some point, the Strodes returned home, and Rogers

---

[34] The prosecution pointed out in closing the obvious fact that *an actor* could be acting when exhibiting symptoms of mental illness: "[T]hat acting school prepared the defendant for [the] most important role he would ever play in his life, the greatest play acting that he would ever have an opportunity to carry out."

murdered them. Rogers then dragged Meriam's body to those of her parents and covered them. The prosecution argued that the movement of one and covering of all three bodies revealed consciousness of wrongdoing. Rogers then fled the scene, leaving his meal unfinished. As the prosecutor argued: "Do you flee from something that you have done that is not wrong?"[35] Rogers shot at someone as he left the area, fearful that someone had discovered his crimes. And he tried to and eventually did enter Canada. A month later, by confessing to doing "it" in self-defense after being arrested, Rogers displayed knowledge of the nature and quality of his acts.

Consider the deliberate omission of any mention of the individual experts' testimony, as well. The prosecution's case-in-chief hinged on expert testimony being irrelevant to the question of legal sanity—not just the expert testimony that the jury heard, but any possible expert testimony. During closing arguments, the prosecution hardly mentioned the experts who had testified in the trial. As the prosecution argued, the defense could "march every psychiatrist in this country into this courtroom but it will not tell you . . . what happened there at that time." And in its rebuttal closing argument, the prosecution further dismissed the relevance of expert testimony. Instead, it pointed out that "the best psychiatrist [the defense] could . . . bring in here on their

---

[35] The court instructed the jury on flight: "The flight of a person immediately after the commission of a crime that has been committed or after he is accused of a crime, is not sufficient in itself to establish his guilt but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. Whether or not evidence of flight shows a conscientiousness of guilt and the significance to be attached to such a circumstance are matters for your determination. Flight is defined as the deliberate attempt to avoid apprehension or prosecution."

behalf . . . indicated that [Rogers] was extremely dangerous." But regardless of any "labeling of paranoid schizophrenia," legal sanity turned on whether Rogers knew "the difference between right and wrong." As the prosecutor told the jury, "[A]ll of this other monkey business has nothing to do with this case." It did not matter if the defense "talk[ed] all day about being examined by the psychiatrists and psychologists." The prosecution also highlighted Rogers's acting abilities, noting that he fooled various "psychiatrists that they marched in here."

Against this backdrop, defense counsel of the highest quality would have been unlikely to establish legal insanity under *M'Naghten*. The facts and the prosecution's theory of the case dramatically reduced the relevance of any expert testimony. No matter the addition of Dr. Molde's testimony and better preparation of the experts who were called to testify, the prosecution proved facts that overwhelmingly established that Rogers knew right from wrong and understood the nature and quality of his acts when he killed the Strodes.

\* \* \*

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). Rogers has not done so here. Even if counsel's errors identified by the majority were constitutionally deficient, those errors did not prejudice Rogers's defense. And the sequence of events before, during, and after the murders, considered alongside the prosecution's dismissal of the relevance of expert testimony, makes it extremely unlikely that any defense counsel would have proven that Rogers was legally insane when he committed the killings.

The majority's holding works a great wrong. Mark Rogers brutally murdered three innocent people more than forty-one years ago. The evidence of both his guilt and his sanity was overwhelming.[36] I join my colleagues in the majority in decrying Nevada's choice of woefully inexperienced counsel in a capital case. The State should have done better. But forcing Nevada either to conduct a new trial forty-one years later or adjudge Rodgers not guilty by reason of insanity is not a constitutionally permissible remedy for its failings. We are bound by *Strickland* and its progeny, and Rogers does not make out a case entitling him to the relief he obtains here. Because the facts and the law require that we deny Rogers's petition for a writ of habeas corpus, I respectfully dissent.

---

[36] The majority accuses of me of saying that *because* the evidence of Rogers's guilt was overwhelming, the evidence of his sanity was necessarily overwhelming, thus, missing that "the fact that Rogers killed the victims, even if clearly established, does not establish that evidence of 'his *sanity* was overwhelming.'" Majority Op. at 50 n.15. I don't, however, say that *because* the State proved that Rogers murdered three people, the State necessarily established that Rogers was sane. I say that based on the facts, the evidence of both Rogers's guilt *and* Rogers's sanity were overwhelming.

The majority also claims I don't explain *why* the evidence of sanity was overwhelming (while in the same paragraph acknowledging that "Rogers killed his victims in calculated and cold-blooded ways and persistently attempted to avoid capture, including fleeing to the Canadian border"). Majority Op. at 50 n.15. I respectfully disagree and believe the facts the State proved (and that I have described) overwhelming demonstrate that Rogers was sane when he murdered the Strodes.